LACKLAND et al., TRUSTEES UNDER WILL OF HENRY SHAW, v. WALKER, ATTORNEY-GENERAL, Appellant.

In Banc, June 30, 1899.

1. **Charitable Trust: CHARITY: CREATED BY WILL.** A devise of property "to provide for the use of the public a botanical garden easily accessible, which shall be forever kept up and maintained for the cultivation and propagation of plants, flowers, fruit and forest trees, and other productions of the vegetable kingdom, and a museum and library connected therewith and devoted to the same and the science of botany, horticulture and allied objects," to be preserved "to the use and enjoyment of the public for all time," coupled with provisions for the enlargement of the garden, museum, and library, and for the establishment of a fully equipped school of botany and for practical education in that science, defines a charity and creates a charitable trust.

2. ———: ENFORCIBLE IN CHANCERY. A charitable trust will be recognized and enforced by the courts of chancery of Missouri independent of any jurisdiction conferred by St. 43 Eliz. c. 4, or other legislative enactment.

3. ———: ALIENATION: NECESSARY PARTIES. The heirs of the testator are not necessary parties to a petition of the trustees of a charitable trust praying for authority to alienate a portion of the trust property, such heirs having neither a present nor a conditional interest in the premises.

4. ———: ADMINISTRATION: NECESSARY PARTY. Where the public is the beneficiary of a charitable trust, the Attorney-General is the only necessary party to a proceeding involving the administration of the trust estate or the powers and duties of the trustees concerning the same.

5. ———: SALE OF PROPERTY: POWERS OF COURT OF EQUITY. A court of equity has power, by virtue of its general and inherent jurisdiction over charitable trusts, to direct the sale of property devoted to a charity or to modify the directions of the founder concerning the alienation thereof.

6. ———: WILL: CONDITIONAL ESTATE: ADMINISTRATIVE LIMITATIONS. A will creating a charitable trust and providing that the trustees named should not have power to make any sale, conveyance or other disposition of real estate devised as an endowment for the charity, except to lease it for terms not exceeding sixty years with covenants for the perpetual renewal of such leases, does not impose conditions, either precedent or subsequent, upon the quality of the trustees' title, but merely prescribes limitations of an administrative character.

7. ———: PERPETUAL LEASE. Directions in an instrument founding a charity that leases might be made of a part of the endowment for as long as sixty years, with covenants for the perpetual renewal thereof, contemplate a substantial alienation of the property.

8. ———: ADMINISTRATION: JUDICIAL POWER. Where the restraint imposed by an instrument creating a charity is merely upon the power of the trustees named, it is not to be construed to necessarily exclude the exercise of the judicial power of administration in the premises.

9. ———: ———: ———: DIFFERENT MACHINERY. Where a valid charitable trust is created, an impossibility to observe directions made for its management, or a necessity for substituting a different machinery to accomplish the dominant purpose of the founder, warrants the exercise of the powers of a court of chancery in respect of the administration of such trust.

10. ———: DIFFERENCE BETWEEN CREATIVE AND ADMINISTRATIVE PROVISIONS. There is a manifest distinction between provisions defining a charity and creating a trust in its behalf, and directions for the administration of the property devoted to the charity or set apart for its endowment.

11. ———: LANDS: INALIENABLE. It being the very essence of a charity that it shall endure forever, lands which are made the subject of a charitable trust are inalienable, necessarily and by operation of law, in the absence of a grant of express power to sell the same.

12. ———: ———: ———: TEMPORARY INVESTMENT. Lands purchased as a temporary investment by surplus funds belonging to the charity, are not affected by a general provision restraining the alienation of trust property, nor by the rule that lands which are the subject of a charitable trust are constructively inalienable.

13. ———: ALIENATION OF PROPERTY: DOMINANT PURPOSE. In determining whether a court of chancery has power to vary directions concerning the alienation of property set apart as an endowment of a charity, it is to be primarily determined whether the dominant purpose of the founder was that the charity should be conserved, leaving the prescribed administrative details to be modified as might be found necessary from time to time, or whether the directions for the management were intended to be observed, although the charity itself might be imperiled as a result.

14. ———: PRESERVATION: JUDICIAL POWERS: PRESUMPTION OF KNOWLEDGE. Where the preservation of the charity is the controlling purpose disclosed, the directions for the management of the trust are subject to the presumption that the founder knew the existence of a judicial power in the premises and to an implied agreement on his part that this power might be exercised in a proper case.

15. ———: POWER OF ADMINISTRATION: CY PRES POWER. The power of administration exercised by courts of equity in respect of the management of charitable trusts, is different from and independent of the jurisdiction exercised under either the prerogative or the judicial power of *cy pres.*

16. ———: ———: ———: WHAT FOUNDER WOULD DO. When circumstances make it necessary or proper to exercise the power of administration which courts of equity have over charitable trusts, it will be determined, as near as may be, what the founder would do, in view of the altered circumstances, if present and capable of acting, the term *cy pres* being, in this respect, expressive of a limitation and not of a grant of power.

17. ———: ALIENATION OF LANDS: MEANING OF STATUTE. Under an act of the legislature providing that, "it shall and may be lawful for" a named person to devise to trustees certain described lands for the creation of a charitable trust therein mentioned, and "by proper or apt words in said last will ....... to provide that no absolute alienation shall ever be made of said lands," or any portion of the same, the provision as to such non-alienation is not a binding, irrepealable legislative direction, but operates merely to confer legislative permission to create a charitable trust, which it was apprehended, in the then state of conflicting decisions, might not be otherwise upheld.

18. **Enabling Statute**: OUSTING COURT OF JURISDICTION. An enabling act, affirmative in its language and permissive in its nature, can not be construed to oust or affect the general jurisdiction which the courts have over the subject. Such jurisdiction can be impaired only by words negativing its existence or exercise.

19. **Statutory Construction**: PREAMBLE. While a preamble may be looked to in a proper case to elucidate a statute, this can only be done where the language of the body of the act is ambiguous.

20. **Charitable Trust**: STATUTORY CONSTRUCTION: INALIENABLE LAND: : EFFECT ON COURTS OF EQUITY. A statute authorizing the creation of a charitable trust and a devise of lands to trustees under a provision that such lands shall be inalienable by such trustees, is without effect upon the general power of administration which courts of equity have in respect of such trusts generally, and constitutes no obstacle to a decree for the sale of such real estate.

21. ———: ADMINISTRATION: CHANGE IN DIRECTIONS: BENEFICIAL. The details prescribed for administering a charitable trust are not to be altered merely because it will prove beneficial to the charity to do so or of greater convenience in its management, but only upon a showing of actual or impending exigency making it reasonably necessary to decree such change, or upon proof that such details are impossible to be observed in practice. .

22. ———: ———: ———:NECESSITY NOT DETERMINED BY TRUSTEES. The occurrence of the necessity or impossibility which will authorize a decree changing the machinery for administering a charitable trust, can not be left to the determination of the trustees, but must be judicially adjudged as an existing fact; and the sale and other proceedings under such a decree are not had by force of a power conferred by the will, but are based upon the exercise of judicial authority.

23. ———: ———: DIRECTIONS: IMPOSSIBILITY OF OBSERVANCE: CASE STATED: LEASES. Where at the time of the testator's death he was engaged in putting to a test his policy of letting property on ground-leases, and, in his devise to trustees of a charity, directed that they should lease the property devised for the purpose of producing a fund to maintain the charity, and forbade any different alienation, and after his death there developed and became fixed a widespread conviction in the minds of the people against accepting such ground-leases, so that the trustees were unable to lease the property, a finding is warranted that the directions of the testator have become impossible of observance.

24. ———: ———: ———: ———: ———: SPECIAL TAXES: SALE AUTHORIZED. When by change of circumstances certain tracts of suburban real estate have become incorporated into an urban residence district, which is being rapidly built up, by reason of which such tracts are being charged with large assessments to pay for local improvements, such as the opening, grading, and paving of streets and sidewalks, and the construction of sewers, and the trustees are without funds to discharge or pay such items or to protect the property from the enforced sale provided for by the local municipal charter in case of non-payment thereof, a necessity has arisen warranting a decree authorizing the sale of the property.

25. ———: CONDITIONS: EMBODIED IN ORDER OF SALE AND DEED. In directing a sale of property devised as part of an endowment for a charity located in the immediate neighborhood of the charity itself, the court will enforce the directions of the founder as to the use and improvement of such property by embodying such directions as conditions in the conveyances executed under its decree.

26. ———: SALE: PROCEEDS HOW APPLIED. The proceeds of such sales will be directed to be applied to the payment of taxes and assessments against the property used for the charity and against the tracts which are directed to be sold, and to putting such tracts in condition to be advantageously disposed of. The balance of such proceeds will be decreed to constitute a fund for the endowment and maintenance of the charity, and may, with the previous consent of the court, be permitted to be expended in its enlargement.

27. ———: ———: FUNDS: HOW INVESTED. Charity funds will be directed to be invested in Government or State bonds or in such municipal bonds and first mortgage real estate loans as the court may designate or approve, or in the betterment or reconstruction of income-producing properties belonging to the trust estate, or (with the approval and consent of the court) in the purchase or improvement, or both, of other real estate.

28. ———: ———: FORM OF DECREE. A form of decree proper to be entered in such a case is appended to the opinion.

*Appeal from St. Louis City Circuit Court.*—HON. LEROY B. VALLIANT, Judge.

REVERSED AND REMANDED *(with directions).*

Lackland v. Walker.

GEO. W. TAUSSIG *amicus curiae.*

(1)  The legislative power of the General Assembly of 1859, was bounded only by the provisions of the Constitution of the United States and of the State of Missouri.  Special legislation was not prohibited.  The act of the General Assembly approved March 14th, 1859, passed at the request of and for. the benefit of Henry Shaw, accepted by him, constituted a "contract" between the state and Henry Shaw, and a "contract" between the state and the trustees under Henry Shaw's will.  The decree of the circuit court impairs the obligation of said contract, and is in violation of the Constitution of the United States and of the State of Missouri. Const. U. S., art. I, sec. 10; Washington University v. Rowse, 42 Mo. 308; s. c., 8 Wall. 432; Hamilton v. St. Louis Co., 15 Mo. 3; Dartmouth College v. Woodward, 4 Wheat. 518; Cooley, Const. Lim. (6 Ed.), ch. V. and pp. 205, 334; State v. Adams, 44 Mo. 570; In re. Roe, 119 N. Y. 509.   (2)  The paramount purpose of his will was to create a fund which could not take unto itself wings.   Such a fund he knew could only be derived from land leases.   The decree of the court destroys the paramount purpose and intention of the testator; it is in direct conflict with the letter as well as the spirit of the will.  (3)  The decree can not be sustained by the principle of *cy pres.*   Story, Eq. Jur., sec. 1141a; Chambers v. St. Louis, 29 Mo. 543; Moggridge v. Thackwell, 7 Ves. Jr. 36; Mo. Hist. Society v. Academy of Science, 94 Mo. 467; Tudor's Charitable Trusts, Title, Cy Pres; 5 Am. and Eng. Ency. of Law (2 Ed.), "Charities."   (4)  The decree authorizing the sale is unwarranted by the rule of *cy pres.* Att'y-Gen. v. Buller, Jacob's Rep. 407; In re Mason's Orphanage, 1 Law Rep. 596; Att'y-Gen. v. Mayor of Rochester, 2 Simons, 34; Academy of Visitation v. Clemens, 50 Mo. 167; Att'y-Gen. v. Warren, 2 Swanston, 291.   (5)  In 1859 the Legislature granted to Henry. Shaw the power to so.

convey his real estate as to secure for the institution, which he already then contemplated creating, "a permanent fund for all time;" the legislature acknowledged that it understood he had in contemplation to devise or convey to trustees his real estate (embracing all of the six parcels affected by the decree) to be used for the purpose of maintaining a perpetual fund . . . . by leasing portions thereof for a term of years, or upon ground or building leases;" the Legislature declared "that to secure to the said institution a permanent fund for all time, which will not be diverted from the specific objects which it is designed to support, it is essential that the said real estate shall be so conveyed or devised and held that the same shall not be alienated or alienable;" the Legislature therefore decreed that it shall be lawful for Henry Shaw to so devise and convey his property, real or personal, for the aforesaid uses, purposes and trusts, and by proper and apt words in said last will or deed or deeds to provide that no absolute alienation shall ever be made of said lands or any portion of the same by the trustees therein appointed, their successors or assigns in said trust, but that the same shall forever remain sacred for the objects and purposes of said trust deed." That this trust is fastened upon the land can not admit of a doubt. Wherever a person by will gives property, and points out the subject, the property and the way in which it shall go, a trust is created; unless he shows clearly that his desire expressed is to be controlled by the trustee, and that they shall have an option to defeat it. Inglis v. Trustees, 3 Peters, 100; Murphy v. Carlin, 113 Mo. 117. (6) Plaintiffs' theory of Henry Shaw's paramount reasons in prohibiting alienations is not based upon the testimony or the will. Patterson v. Camden, 25 Mo. 13; Gillman v. Hamilton, 16 Ill. 225; Att'y-Gen. v. Governors, etc., Law Rep. ch. D., 1896, p. 888. (7) The allegations of the petition, the opinions of plaintiffs' witnesses, the finding of the court, that it is impossible or impracticable to carry out the inten-

tions of the testator as to leasing the "six parcels or any part thereof," are in positive contradiction to the facts of the case. It is practical to lease these six parcels in compliance with the will; five of them are actually so leased. (8) The trustees did not make proper efforts to carry out the directions of the will as to leasing parcel number 3. (a) They erroneously limited the use of the property by the lessees to residences. costing $5,000 to $10,000, excluding persons whom they were not authorized by the will to exclude from offers to lease. (b) They fixed an exorbitant rental upon the property in place of offering the property for lease for what it would bring, in addition to taxes and assessments. (c) They attempted to lease the property for residence purposes on a street, wholly unimproved, without sewers or gutters, water or gas; with nothing ascertainable as to the expense of such improvements which the lessees would be obliged to assume and pay. (d) They attempted to lease the property in times of panic and monetary confusion, when it was "impractical and impossible" not only to lease property, but to sell property, in nearly every district of the city. (e) They excluded storekeepers, florists, gardeners, and all others, except residental owners, from becoming lessees. This is in violation of the express directions of the will.

Judson & Taussig for respondents.

(1) A restraint upon alienation of real property imposed upon the trustees of a public charity as a direction for the management of the charity, is subject to the control of a court of equity, and the alienation of such property, notwithstanding the imposition of such restraint, may be authorized by the court when found essential to the beneficial administration of the charity. 2 Perry on Trusts (4 Ed.), sec. 737; 1 Lewin on Trusts, sec. 547; 2 Story Equity Juris., sec. 1177; Stanley v. Colt, 5 Wall. 119; Odell v. Odell, 10 Allen, 4; Brown v. Meeting Street Society, 9 R.

I. 177; Sohier v. Trinity Church, 109 Mass. 17; In re Mercer Home Charity, 162 Pa. St. 239; Ould v. Washington Hospital, etc., 95 U. S. 312; Jones v. Habersham, 107 U. S. 175; Curar v. Williams, 145 Ill. 625; Hicks v. Hobson, 6 L. R. A. 157; Att'y-Gen. v. South Sea Co., 4 Bevan, 458; Att'y-Gen. v. Wilson, 3 Mylne & Keen, 362; Moggridge v. Thackwell, 7 Ves. 36. This principle is clearly established in the jurisprudence of this State by an unbroken series of decisions as the established law governing the administration of charitable trusts. Academy of Visitation v. Clemens, 50 Mo. 167, citing and following Stanley v. Colt, 5 Wall. 119. See, also, Goode v. McPherson, 51 Mo. 126; Schmidt v. Hess, 60 Mo. 591; First Baptist Church v. Robberson, 71 Mo. 326; Howe v. Wilson, 91 Mo. 47; Powell v. Hatch, 100 Mo. 592; Mo. Hist. Soc. v. Academy of Science, 94 Mo. 459; Barkley v. Donnelly, 112 Mo. 561. (2) The will of Mr. Shaw establishes and undertakes to provide for the perpetual maintenance of a public charitable trust, and for the development and expansion of such charity, whereof the botanical gardens devised to his trustees is only the beginning. The restraint upon alienation is imposed as a means, and not as an end. The purpose was to secure for all time the character of the surroundings of the gardens, and at the same time secure a permanent fund for the support of the trust. (3) The evidence is uncontradicted and conclusive that it is impossible to accomplish the ends for which the will provides, to wit, the securing of a supporting revenue for the trust, through leases of this property. But with the removal of this restraint, the revenue can be secured for the support of the trust and surroundings of the gardens preserved as contemplated by the testator. The removal of this restraint is required, not only for the better administration of the trust, but for its preservation, which is imperiled under the present condition. (4) The only suggestion made at the hearing below in opposition to the prayer of the trustees, to wit, that the trustees themselves should pay the cost of the impending special assess-

Lackland v. Walker.

ments, would be itself a violation of both the spirit and letter of the will. It is not only impracticable, in view of the overwhelming amount of these impending assessments, but would be wholly unavailing as a means of preserving and extending the trust. (5) There is nothing in the act of March 14, 1895, which impairs the power of the court to grant this relief. (6) The Attorney-General was properly made a party defendant. Story on Equity Plead., sec. 222; Newbury v. Blatchford, 106 Ill. 584; Att'y-Gen. v. Library, 51 Ill. App. 173; Jackson v. Phillips, 14 Allen, 539; Harvard College v. Society, 3 Gray, 280; American Acad. v. Harvard College, 12 Gray, 586.

F. N. JUDSON in supplemental brief for respondents.

(1) It is claimed that the Act of 1859, "passed at the request of and for the benefit of Henry Shaw, accepted by him, constituted a contract between the estate of Henry Shaw, and a contract between the State and the trustees under Henry Shaw's will." The Act was approved March 14, 1859. The will was executed on January 20, 1885. Mr. Shaw died August 25, 1889. It thus appears that up to the very day of his death, Mr. Shaw was at liberty to do whatever he pleased with these lands and the garden. He could have sold the property, or given it away, or he could have devised the lands to whom he saw fit, or he could have died intestate, and his whole estate would have gone to his heirs. The will of course, was ambulatory until his death. Mr. Shaw paid nothing, and was bound to nothing. The State had simply empowered him to make such disposition of his property, if he saw fit to do so, and in his will he recites that he avails himself of this power in the Act "as far as necessary." (2) Counsel scoffs at the testimony of Mr. Hitchcock, that there was uncertainty in 1859 as to the law of this State on the subject of devises for charitable uses. But it is nevertheless true that the decision in Chambers v. St. Louis, 29 Mo. 593,

in March, 1860, was the first authoritative declaration in this State of the law upon this subject. The contention is that the effect of this act was to abolish the rule of *cy pres* in regard to the trust to be established by deed or will by Henry Shaw. That is to say, the Legislature intended that if Henry Shaw established a certain charity the courts should never apply the *cy pres* doctrine in its administration. Then the act so construed was unconstitutional and void. State v. Fry, 4 Mo. 120; State v. Sloss, 25 Mo. 291; Riggen v. St. Louis Co., 8 Mo. 477; Weatherford v. King, 119 Mo. 57; Cornwell v. Orton, 126 Mo. 355; Russell v. Allen, 107 U. S. 167. (3) The theory of contract, therefore, makes the lands inalienable forever, irrespective of benefit to the charity. In other words, it is an act permitting Mr. Shaw to deed or will the lands in mortmain, and forever exempts it from judicial power of administration, which is inherent in and essential to every charity. But in Missouri this is not a legislative or a prerogative power, but a judicial power, requiring no legislative action, as shown by the unbroken line of Missouri cases. Academy of Visitation v. Clemens, 50 Mo. 167; Goode v. McPherson, 51 Mo. 126; Schmidt v. Hess, 60 Mo. 591; First Baptist Church v. Robberson, 71 Mo. 326; Howe v. Wilson, 91 Mo. 47; Powell v. Hatch, 100 Mo. 592; Mo. Historical Soc. v. Academy of Science, 94 Mo. 459; Barkley v. Donnelly, 112 Mo. 561; Women's Christian Ass'n v. Campbell, 147 Mo. 103. (4) The court being thus free to exercise its power, it remains to be seen whether a case has been shown for the exercise of that power. It is our contention that it has been conclusively demonstrated that it is not only for the benefit, but for the preservation, of the charity established by the testator that this restraint upon alienation should be removed. The question is, shall the ends of the testator be sacrificed to the means prescribed by him or shall the means be modified by the court in the plentitude of its power in order to secure the cherished ends which he had in

view.   Philadelphia v. Girard Heirs, 45 Pa. 9; Att'y-Gen. v. Rochester, 2 Simeon, 34; 11 Am. and Eng. Ency. of Law (1 Ed.), 821; Garesche v. Priest, 9 Mo. App. 270; s. c., 78 Mo. 126.   (5)   The argument against the decree is based on two grounds, the Act of 1859 and the insufficiency of the evidence to support it. It is true that points of the brief of the *Amicus Curiae* are entitled "the decree can not be sustained by the principle of *cy pres*," and "the decree authorizing the sale is unwarranted by the rule of *cy pres*," but nothing is set out sustaining this contention.   The decisions from which liberal quotations are made as we read them, afford no support whatever to the position asserted.   It is said in the brief that Stanley v. Colt, 5 Wall. 129, is not applicable because it is based upon legislative sanction.   But the opinion distinctly states that the power exercised in Connecticut by the legislature is in its essence a judicial power, and the case is cited by this court in Academy of Visitation v. Clemens, 50 Mo. 167, as an authority for the judicial application of the *cy pres* doctrine to the authorization of the sale of the property of a charity.   But further discussion upon this point is rendered needless since the decision of this court already cited in the Women's Christian Association v. Campbell, 147 Mo. 103. (6)   If appellant's contention prevails it means that in construing the will establishing this charity the object must be sacrificed to the means; that Mr. Shaw deliberately made a will devolving upon these trustees the establishment of this great charitable foundation, which was the cherished purpose of his lifetime, and yet incumbered it with conditions which will postpone its realization for the indefinite future, perhaps for a century, and may imperil its very existence.   Counsel forgets that it is only because of the charity that a conveyance or devise to charitable uses can be sustained against the rule of perpetuities.   If the conditions imposed prevent the development of the charity, even for this generation, it was clearly against public policy and void.   (7)   The decree was

fully warranted by the evidence. It is fully demonstrated that the removal of the restraint upon alienation is essential, not only in order to benefit, but to preserve the charity.

## STATEMENT OF THE CASE.

Henry Shaw, a native of England and for many years a prominent citizen of the city of St. Louis, died on August 25, 1889, leaving a last will and testament, dated January 26, 1885, which has been duly probated. The instrument contains legacies to and other provisions in behalf of the testator's sister and collateral relatives; his housekeeper, and other employees and servants, and several of his personal friends; and bequests of various sums and other interest to a large number of established charitable institutions. The will is, however, principally devoted to the testator's manifestly long-cherished plans in respect of the Missouri Botanical Garden. The provisions in that behalf are as follows:

"I, Henry Shaw, of the city of St. Louis and State of Missouri, of sound and disposing mind, but mindful of the uncertainties of life, and desiring specially to carry out and provide for certain objects which have been the subject of thought and labour and care for many years past, more effectually than I have heretofore done, do make, publish and declare this as and for my last will and testament, hereby revoking all other wills by me at any time heretofore made, in manner following, that is to say:

*First Clause.*—I give and bequeath unto M. Dwight Collier, Henry Hitchcock, Wm. H. H. Pettus, Dr. John B. Johnson, Adolphus Meier, Wm. G. Eliot, who is now Chancellor of the Washington University, and his successors in office; Charles F. Robertson, who is now Bishop of the Episcopal Church of the Diocese of Missouri, and his successors; David F. Kaime, James E. Yeatman, Judge Samuel Treat, Joseph W. Branch, Gerard B. Allen, Rufus J. Lackland, Judge G. A. Madill; the president for the time being of the public

schools, and his successors in office; the president for the time
being of the Academy of Science of St. Louis, and his suc-
cessors; the Mayor of the city of St. Louis, and his successors
in office; Dr. Asa Gray, of Cambridge, Mass., and Prof.
Spencer F. Baird, secretary of the Smithsonian Institute,
Washington City (the two last named, as honorary trustees,
are added to the trust in recognition of their scientific emi-
nence and ability), the following real and personal property,
to wit:   (Specifically describing the tract on which the Mis-
souri Botanical Garden is situated, and also six other tracts
of real estate, all lying west of Grand and within the present
limits of said city, and shown in red on the plat hereinafter
set forth); together with the improvements thereon; as also,
all the household and kitchen furniture of all kinds and de-
scriptions in the house now occupied by me on the tract of
land first herein described by me; as also, all the plants, trees,
flowers, and shrubs, contained in the garden grounds, conser-
vatories, green houses, hot houses, and other structures situ-
ated therein; all the library, and books, and paintings in said
house and museum building, and stuffed birds and animals
in said museum buildings, and the herbaria of dried and pre-
pared plants and specimens therein; all the implements of
gardening, horticulture, and husbandry; and, also, all farm-
ing utensils, horses, cattle, hogs, poultry, hay, grain, provi-
sions, and groceries in and about the said premises herein first
mentioned and conveyed, and the houses, stables and barns
situated thereon.    To have and to hold the said real and per-
sonal property to them and the survivors of them, and their
assigns in office, forever, in trust, however, for the following
uses and purposes, as joint tenants in common, to wit:
Whereas, I have for many years been engaged in laying out
and establishing a botanical garden, with a museum and
library connected therewith, upon a portion of the tract first
described, and which is now known as the Missouri Botanical
Garden, with the design at the time of my death to convey

the same, with other property, to trustees, for the object and with the view of having for the use of the public a botanical garden easily accessible, which should be forever kept up and maintained for the cultivation and propagation of plants, flowers, fruits and forest trees, and other productions of the vegetable kingdom, and a museum and library connected therewith and devoted to the same, and to the science of botany, horticulture, and allied objects; and whereas, as a means of enabling me more effectually to secure the object I have in view and to preserve the same as to the use and enjoyment of the public for all time, the General Assembly of the State of Missouri did pass an act, entitled an act to enable Henry Shaw to convey and devise to trustees certain lands, which was approved of on the 14th day of March, 1859; and as it was with the design of carrying out the purpose and object upon which I have been so long engaged, and availing myself of the power given me in said act so far as necessary, I have herein given, devised and bequeathed to said trustees the property herein specified.   I do now declare the uses, purposes and trusts which said trustees hold the said property to be as follows:

"First:   The said trustees shall not have the power to make any sale, conveyance or disposition of the real estate herein devised to them, or any portion thereof, except as herein specified.

"Second.   Said trustees shall forever keep that portion of the said tract first described, which is now occupied by the Botanical Garden, Fruiticetum, Arboretum, Museum, my residence, with such other extent of land as from time to time they may find it expedient or necessary to add thereto for the extension of the said botanical garden and grounds, including the residence of the director thereof, as a botanical garden for the propogation and cultivation of specimens of plants, flowers, (and) fruit and forest trees, for the promotion of science and knowledge, which shall be kept open during such

hours and under such regulations as they shall prescribe every day, except Sundays, for the use of the public at large.

"Third. The residue of the real estate not required for the immediate purposes of the said botanical garden in extending the same, whenever it shall appear or seem to the said trustees necessary, shall from time to time, as the same can be advantageously done, be leased by said trustees as follows: Such portions thereof as can be advantageously leased upon building leases, shall be leased for a term not exceeding sixty years, with a provision in such leases for perpetual renewal thereof for succeeding terms of not more than sixty years, at a rent to be fixed by valuation to be made as therein provided at each term of renewal. Such leases shall also contain a provision that the lessee, as a part of the rent, shall pay all taxes, general and special, and assessments that may be levied or assessed upon said land so leased. It is my design and object not only that the land so leased shall afford an income or revenue for the support of the said botanical garden, but that it may in the future be so leased as by its improvement its contiguity may be pleasant and attractive to the visitors and students of the botanical garden. The said trustees may lease the cottages already erected, and such portions of the said real estate hereinbefore devised as they do not use for the garden, and can not profitably lease for building purposes, on short leases to nurserymen, florists, vegetable and market gardeners, and others.

"Fourth. Of the trustees herein mentioned to whom the real and personal property is hereby devised and bequeathed, the Mayor of the city of St. Louis, and the Chancellor of Washington University, the Bishop of the Episcopal Church, the President of the Public Schools, and the President of the Academy of Science, are hereby constituted such trustees by virtue of their offices, and not as individuals, and upon their ceasing to be such officers, their functions as such trustees (shall) cease and their successors in office (be) imme-

diately vested with such title to the property, and such rights and duties in relation to the said trust as was possessed by the person ceasing to be such officer. In the event of death, resignation, removal from the city, or permanent inability to serve, of any of the said trustees, the remaining trustees will proceed to elect some person fitted by his social position, character and tastes to fill the vacancy; and when any person shall be elected to fill any such vacancy, the other trustees shall by proper instrument clothe him with the same trusts, interests and power over the said trust property as was possessed by the trustee in whose place he was elected. In the event of the death of the said Eliot or the said Robertson, I recommend to the said trustees to fill the vacancy by electing the person who shall succeed to the office or station of the deceased persons above named, and that such selection may be continued to be made upon the death of the individual holding of such office and station, so long as the trust shall endure. The said trustees and their successors in office as herein provided, shall constitute a board of trustees, and said board shall keep written minutes of their proceedings, shall appoint such executive of such board as they may think fit, and the acts of a majority of the members of said board, done at any meeting regularly held or called, shall be deemed or taken, for all the purposes of the trust, to be the doings and actings of said board and of said trustees; and due notice of any such meeting shall be given by written or printed notices deposited in the post office to the address of each trustee. The said trustees as such board shall, in accordance with said trust, have full power and authority over, and control of said property hereby devised and bequeathed to them, and the revenue thereof, and its collection and the distribution of the same. They shall have the power of the appointment and removal of the director and all the other servants and employees connected with the carrying out the objects of the trust. They shall also have the power to prescribe the duties

which said director shall perform; and the other employees and servants connected with the carrying-out the objects of the trust, shall be appointed by them, giving due weight to the recommendations of the director. The said trustees shall have the power, whenever they shall have an adequate revenue and they shall deem it advantageous, to establish public lectures upon botany and its allied sciences; and they may at any time call upon the director to give the same as a part of his regular duties. The trustees shall have the power to provide for an addition to the collection of plants, flowers, shrubs, and trees, indigenous to this or other states or countries, when, in their judgment, the means at their disposal will authorize it, and make from time to time exchanges of plants, flowers, and herbaria, and may provide for the increase of the museum and library and its enlargement, when necessary.

"Fifth. There shall always be a director to said botanical garden and institution, to be appointed as hereinbefore provided, and said board of trustees shall from time to time prescribe his duties; but when within the sphere of his duties thus prescribed and while he shall faithfully perform those duties thus prescribed, the said director shall not be subject to the interference, management or control of said board; but this is not to be construed so as to take away from the board the permanent control over the garden and grounds of said institution. The director shall always reside upon the grounds specifically set apart for the said institution and garden, and shall have the general superintendence and control of and over the gardeners and labourers employed in and about said garden and grounds, and he shall have the general superintendence and charge over the garden grounds, museum · and library of said botanical garden. He shall devote his entire time and efforts to the interests of said institution, and he shall, when thereto required, deliver lectures at such place as said trustees may appoint, upon botany and

matters connected therewith, and he shall (so) employ his energies that from year to year the institution under his charge shall grow up in efficiency in promoting the ends in view in its inception. When required he shall meet with the board of trustees, and co-operate with them in matters connected with the interests of the said institution.

"Sixth. The yearly revenue only of the property hereinbefore devised and bequeathed, except such portions of the property hereinafter devised and bequeathed as is set apart for and to be expended on specific objects and uses, shall be applied to the maintenance, preservation, and enlargement of the objects of this trust. The said yearly revenue, after deducting expenses of collection, taxes, insurance, and repairs, as also of the property hereinafter devised and bequeathed, shall be applied, first, to the payment of the salaries of the director, assistants, professors, and gardeners, and the payment of wages of the employees and labourers; in keeping up the grounds in good style and providing for the preservation and increase of the plants and trees, and preserving the buildings and inclosures of the grounds; and, secondly, the purchase of plants, flowers, and trees; additions to the library; the enlargement and improvement of the garden, when necessary or advisable; and such other expenditure as from time to time may be found necessary in furtherance of the purpose of this trust.

"*Second Clause.*—Having established, maintained and kept for use of the public for many years the Missouri Botanical Garden, and wishing to perfect my endowment of it, and to augment and perpetuate its usefulness by connecting with it a School of Botany for the promotion of education and investigation in that science, and its application to horticulture, arboriculture, medicine, and the arts, and for the exemplification of the Divine Wisdom and Goodness as manifested throughout the vegetable kingdom:

"First.   Wherefore, I hereby give and bequeath to the Washington University of St. Louis a certain lot of ground, with improvements thereon in block number twenty-seven (27) of the city of St. Louis (describing it), the income of which is to be used solely for the maintenance of a school of botany.   Said income to be used exclusively to pay the salaries, and to defray the necessary incidental expenses of those engaged in botanical instruction and researches at the garden, and, as need may require, also within the precincts of the University; also, for the maintenance of the requisite botanical laboratories and their equipment, with instruments and appliances for illustration and investigation; for the maintenance and increase of a botanical library and herbarium; and for such like objects strictly germane to a school of botany.

"Second.   To secure harmonious co-operation, I require that the professor or professors in the said school of botany shall be either the director of the Missouri Botanical Garden, or the person next to him in rank, under whatever title, or both of them, or, when this is impracticable, said professor or professors, or teachers, shall be appointed either by the nomination of the trustees of the Garden, and approval of the corporation of the University, or else, upon the nomination of the latter and approval of the former; and whenever the income, net, of the property hereby bequeathed to the said University shall fall short of three thousand, five hundred dollars per annum, I require that the trustees of the garden shall pay over to the said University, such sum of money as may be required to make the annual income equivalent to three thousand, five hundred dollars per annum.

"Third.   I hereby empower the trustees of the Missouri Botanical Garden to allot, if they think it expedient, from time to time, any of the income not needed for the development and maintenance of the said garden, to the augmentation to the means and appliances of instruction, and, also,

when required and found needful, to the erection of another building, similar to the one now occupied as museum and library, to be situated west of the same, and equidistant from the residence.

"Fourth. I declare my intention that instruction to garden pupils shall be attended to, both in practical and scientific horticulture, agriculture and arboriculture, and consider it an important feature to always keep up the ornamental and floricultural character of the garden.

"Fifth: I also declare that scientific investigations in botany proper, in vegetable physiology, the diseases of plants, the study of the forms of vegetable life and of animal life injurious to vegetation, experimental investigations in horticulture, arboriculture, etc., are to be promoted no less than instruction to pupils; but I leave details of instructions to those who may have to administer the establishment, and to shape the particular course of things to the condition of the times.

"*Third Clause.*—In addition to what I have already above devised and bequeathed to said trustees above mentioned, constituted and appointed, I hereby devise to said trustees, above mentioned, with view and for the purpose of creating the fund the net income of which, and that alone, is to be applied to the support and improvement of said Missouri Botanical Garden, and under the trust as above designated, the following property real and personal, to wit (specifically describing twenty-nine different parcels in the city of St. Louis, twenty-eight of which are located east of Grand avenue and constitute properties used and suitable for business purposes. The twenty-ninth tract described in this clause of the will is located some distance west of tracts five and six involved in this clause, and is apparently adapted to use as a site for manufacturing purposes). . . .

"Thirtieth. In the tenth and preceding paragraph of this my will and testament, I devise and bequeath my prop-

·erty in block 181 of said city to said Botanical Garden, includ-
ing my present city residence, corner of Locust and Seventh
streets, which said residence being built of good and durable
materials, but unsuitable to its present locality, it is my desire
that, when deemed advisable by the trustees of said Missouri
Botanical Garden, to have the said residence carefully taken
·down and rebuilt on Tower Grove avenue in some convenient
·situation in contiguity to said Botanical Garden; and for the
·said removal and rebuilding I hereby bequeath to the said
trustees the sum of ten thousand dollars; and the ground, so
·divested of said residence, to be leased by said trustees for
·such term as they may deem expedient for the benefit of said
Missouri Botanical Garden.

"*Fourth Clause.*　.　.　.

"Twenty-fourth.　I hereby bequeath one thousand dol-
lars annually for a banquet to the trustees of the garden, and
to the guests they may invite, literary and scientific men and
·friends and patrons of the natural sciences, to be paid each
year out of the funds devised for the support of the garden;
also, four hundred dollars annually from the same fund for a
banquet to the gardeners of the institution and invited florists,
nurserymen and market gardeners of St. Louis and vicinity,
·said banquet to be presided over by the director of said Botan-
·ical Garden.

"Twenty-fifth.　I hereby bequeath five hundred dollars
·annually for premiums or prizes to a flower show or exhibi-
tion, when such flower show may be established by amateurs
·and horticulturists of St. Louis to be paid each year out of the
·funds of the garden.

"Twenty-sixth.　I hereby devise and bequeath two hun-
·dred dollars annually to the bishop of the Episcopal church
of this diocese, in consideration (if he approve of the same)
that an annual sermon be preached in such church and by
such minister as he may select, on the wisdom and goodness
·of God as shown in the growth of flowers, fruits and other

products of the vegetable kingdom; to be paid annually out of the funds of the said Botanical Garden.  .  .  .

"Thirty-third.   Having provided a mausoleum and tomb in the grove of the Missouri Botanical Garden, my desire is to be buried in the same, and upon which some work remains to be done, which, if not finished in my lifetime, I hereby devise twelve thousand dollars to finish the same (and for other purposes herein mentioned); the work of the mausoleum and monument to be completed, if so required, agreeable to plans in the hands of Mr. Geo. I. Barnett, the architect, and also to pay for the gravestone, if so required, shortly expected from Munich, Germany.   It is also my desire that a small brick cottage be provided as a residence for a man to be employed, whose duty it shall be to keep in order the said mausoleum, museum building or buildings, the grove, and the grounds around, for all time to come; salary to be paid out of the general fund belonging to the said trust and said employee to be under the control of the director of the garden, same as the other employees of the aforesaid institution.  Also, out of the devise of twelve thousand dollars, fifteen hundred dollars to my aforesaid housekeeper, for my funeral expenses, and not to exceed that sum, agreeable to my written memorandum of items left with her as instructions.   It is also my desire that the remains of no other person be buried within the limits of the Missouri Botanical Garden.

"Thirty-fourth.   In the first clause and second paragraph of this my last will and testament, I devise and express my wish that the garden shall be kept open, under necessary regulations, Sundays and holidays excepted, every day of the week.   Now, as this trust is made for the use of the citizens of St. Louis as well as the public in general, it is my wish that for the convenience of said citizens and public, that the Garden shall be open to visitors two Sundays in each year, viz:   The first Sunday in June and the first Sunday in September, from 2 p. m. to sunset.

"Thirty-fifth. I hereby direct my administrator or executor, as soon after my decease as it can be done, to turn over to the trustees aforesaid of the Missouri Botanical Garden, named in the first clause of this my will, all the real estate devised to them in this will; also, all the personal property of all kinds, devised and bequeathed to them contained in and upon the said garden and grounds, or upon the tract herein first described; the house, buildings and improvements thereon; and as there will be found an inventory of the plants connected with and embraced in said Botanical Garden and grounds, or upon the tract aforesaid, and as the plants are removed at times from the plant houses into the garden, it is sufficient for my executor or administrator to inventory said plants for the purposes of my estate, as the plants, flowers, and shrubs belonging to the Missouri Botanical Garden as contained in inventory, and said trustees shall receipt to my executor or administrator in full of such plants, etc., as contained in said inventory, as the shrubs, plants and flowers of the Missouri Botanical Garden.

"Thirty-sixth. Also, all the residue of my estate real and personal, or mixed, which I may leave, or be possessed of at the time of my death, which shall not have been in this my will devised, bequeathed and disposed of, I devise and bequeath to said trustees. To have and to hold to them and the survivors of them, and their successors in said trust forever, upon the said uses and trusts above mentioned."

A life estate in three parcels situate near the eastern end of tract four hereinafter referred to, with the residences thereon, was devised, respectively, to the testator's sister, housekeeper, and a cousin, with remainder over to trustees of the Botanical Garden as a part of the endowment thereof.

On February 24, 1896, the then trustees under the foregoing will instituted this equitable proceeding, making the Attorney-General of Missouri and the heirs at law of said Shaw, parties defendants thereto.

The petition alleges that said Shaw had for many years prior to his death, at his own expense, established and maintained said Botanical Garden and a museum and library in connection therewith, upon a tract lying near the western limits of the city of St. Louis, consisting, in its entirety, of about 125 acres.  It is also alleged that the other six tracts referred to in the first clause of said will, and there described generally as lying west of Grand avenue and south of McRee avenue, are all more or less contiguous to said gardens, and contain an aggregate of about 300 acres; and that nearly the whole of said tracts is vacant and unimproved and can be adapted advantageously and consistently with the provisions of the whole relative thereto, only to residence purposes.

The extent and relative conditions of the Botanical Garden and of said six tracts, and the nature of the surroundings generally, are shown by the following plat thereof:

The petition also sets out, in full, the act of the General Assembly of Missouri, approved March 14, 1859, to which reference is made in the first clause of Mr. Shaw's will, as follows:

"An act to enable Henry Shaw to Convey or Devise to Trustees Certain Lands.

"Be it enacted by the General Assembly of the State of Missouri, as follows:

"Whereas, Henry Shaw, of the county of St. Louis, contemplates to convey or devise to trustees certain tracts of land in the Prairie des Noyers Common Fields and in the Gratiot League Square, partly within and partly without the present limits of the city of St. Louis, containing about seven hundred and sixty acres, in trust upon a portion thereof to keep up, maintain and establish a botanic garden for the cultivation and propogation of plants, flowers, fruit and forest trees, and and for the dissemination of the knowledge thereof among men, by having a collection thereof easily accessible; by the establishment of a museum and library in connection therewith, as also, by establishment of public lectures and instruction upon botany and its allied sciences, when it shall be deemed advisable in furtherance of the general objects of said trust; and the remaining portion to be used for the purpose of maintaining a perpetual fund for the support and maintenance of said garden, its care and increase, and the museum, library and instruction connected therewith, by leasing portions thereof for a term of years, or upon ground or building leases, renewable upon valuation; and whereas, for the purpose of securing to the said institution a permanent fund for all time, which will not be diverted from the specific object which it is designated to support, it is essential that the said real estate shall be so conveyed, or devised and held, that the same shall not be alienated or alienable:

"Therefore, it shall and may be lawful for the said Henry Shaw by his last will to devise, and by proper deed or

deeds in his lifetime to convey (making use of both or either of said methods of disposition), to such trustees as he may appoint, for the uses and purposes which are generally set forth above, but which may be more specifically described in the instruments creating the same, the whole or such portions of the following tracts of land as he may deem expedient, to wit: (specifically describing a tract which Mr. Shaw, in 1868, conveyed to the city of St. Louis for park purposes, and which is now embraced in Tower Grove Park; the tract on which the Missouri Botanical Garden is situate; and the tracts numbered one to six, all as shown on the foregoing plat), also such other real estate and such personal property as he may think proper so to devise or convey for aforesaid uses, purposes and trusts ⸺⸺ proper and apt words in said last will or deed or deeds to provide that no absolute alienation shall ever be made of said lands or any portion of the same by the trustees therein appointed, their successors or assigns in said trust, but that the same shall forever remain sacred for the objects and purposes of said trust deed; by proper and apt words in said last will or deed or deeds to provide for the mode and manner of the succession of trustees, and for the removal and substitution of trustees; and it shall and may be lawful for him, among other trustees which may be therein appointed, to appoint such municipal officers of the city of St. Louis, and such executive and judicial officers of this State of Missouri, as he may think proper, by their style of office; and such officers, when so appointed trustees, shall hold by virtue of their office, and not as individuals; and the interest in the real estate and property shall be held by them as such officer, and their successors in the office shall succeed to and be vested with all the rights in the property and powers in the trust originally conveyed to and vested in such officer; and it shall also be lawful for said Henry Shaw to convey said property to and appoint himself as one of said trustees, among others, and in said deed or deeds to reserve to himself the right, dur-

ing his lifetime, to control and manage said garden and institution, and make leases of the lands therein conveyed, as such trustee." (Acts 1858-9, p. 434.)

It is also averred that notwithstanding extensive and earnest efforts to that end, the trustees had found it to be impossible to make a building lease of any part of said six parcels; that since the death of Shaw, the circumstances and conditions affecting the said tracts had largely changed: neighboring tracts had been platted and improved, and streets and alleys laid out through many of them; ordinances had been passed for the opening of streets through the Shaw tracts; and steps were pending to enforce the opening of additional streets and for the making of other public improvements; that a rapid extension and development of that immediate district had largely increased the value of these lands, and the demands and needs of the public and of the adjoining proprietors would necessarily result in the levy of large special assessments against said Shaw tracts, for street and other public improvements, estimated to aggregate $224,000 within the next ensuing three years and $450,000 within ten years; that the trustees were without funds to pay these assessments, and without means to provide such funds; that the general taxes levied against said tracts were in excess of any income which could be derived therefrom; and that such of the property as could be leased at all, had been let to market gardeners and florists for a comparatively small compensation. The estimated value of said six parcels was stated to be about one million dollars, and it was alleged that this would be largely increased by improving and platting the property. The income of the trust from other sources (principally the business properties described in the third clause of the will), it was alleged, yielded too small a surplus to improve and protect the parcels in question. It was also averred that it was contrary to established custom and to the individual convictions now prevalent in the city of St. Louis, to accept such ground

leases as in said will prescribed and to erect residences on leasehold property; that much of the neighboring property had been built up with desirable residences; and that no part of said six parcels would be needed for the extension of said Botanical Garden.

Among other things, the trustees prayed for a decree relieving them from the restraints upon their power to alienate imposed by the first and third sub-paragraphs of the first clause of the above will in respect of said six parcels, and for authority to make a sale thereof and to expend and invest the proceeds of such sale for the benefit of the trust.

The testimony is exceedingly voluminous and, so far as necessary to a decision of this cause, it will be further summarized at appropriate points in the opinion. Upon the showing made, the trial court was moved to enter a decree, as follows, the first paragraph being devoted to a lengthy finding of facts:

"Second. Plaintiffs and their successors in trust are hereby authorized and empowered to sell the above described real estate, or such parts thereof, on such terms and conditions, as they may from time to time deem advisable, at public or private sales; and in making such sales said trustees are authorized, empowered, and directed, in and by the deeds to be executed by them, to impose such restrictions and conditions as may be found practicable, as to the character of the improvements upon said property so sold and the purposes for which the same may be used, so that said property by its contiguity may be pleasant and attractive to the visitors and students of the Botanical Garden. Said trustees are also authorized in their discretion, before making such sales, to lay out, plat, grade, and improve such portions of said tracts as they may deem desirable, as residence parks or districts, with such restrictions as to building lines, cost and character of improvements to be erected by purchasers, and the use to

which said property shall be put, as said trustees may deem desirable and appropriate, in order to realize as far as practicable the said intention of said testator as to the surroundings of said Botanical Garden. Said trustees are also authorized to lay out such streets and alleys as may be necessary to said premises, and if deemed desirable or expedient, to dedicate the same, or parts thereof, as public highways.

"Third. Plaintiffs and their successors in trust are also authorized and empowered to apply the moneys now on hand, and such of the future revenues of said trust as may be available therefor, or such parts of such moneys or revenues as may be deemed by them expedient, in paying the special taxes and other improvements on said premises; and the proceeds of sale of such premises, when sold, may be applied by them to the payment of special taxes which may be imposed on said tracts, or any of them, or the improvement thereof, or to special taxes on, or the improvement of, other said tracts not so sold. Such of the proceeds of sale as may not be required for such purposes, shall be invested in approved securities, or in the betterment, reconstruction, or restoration of the income-producing property of the trust, or in the improvement of any of the unimproved property of the trust, and only the income of such proceeds of sale so invested shall be used for the support of the trust.

"Fourth. And it appearing to the court from the petition that said Henry Shaw in and by said will provided that the said trustees and their successors in trust should constitute a board of trustees, and as such board should keep written minutes of their proceedings, and should appoint such executive of such board as they may think fit, and that the acts of a majority of said board done at any meeting regularly held or called, should be the acts of the said board; and it appearing further to the court that said plaintiffs and their successors in trust have provided for and appointed an executive of said board, known by the name of President of the Board of

Trustees of the Missouri Botanical Garden, and the said plaintiffs in said petition having prayed the court to construe and determine and declare the powers vested by the will in the executive of the board, the court doth further order, adjudge and decree that whenever any deeds or other instruments conveying or affecting real or personal property of the board, or any part thereof, shall have been duly authorized by a majority of the board of trustees, at any meeting regularly held or called, such deed or other instrument in writing, duly executed by the president, or the acting executive of the board for the time being, on behalf or in the name of the board, is sufficient in law under the fourth paragraph of the first clause of said will, to convey all the right, title and interest of said board, and of each member thereof, in said real and personal estate to be conveyed or affected by such instrument, and with the same force and effect, as if each of said trustees had executed the same.

"Fifth. It is further ordered that either party hereto may hereafter, from time to time, apply to the court for such further orders at the foot of this decree as may be necessary for the due execution of the same.

"Sixth. It is further ordered, adjudged and decreed that the cost of this proceeding shall be paid by the plaintiffs from the trust estate under their charge."

From this decree the Attorney-General has appealed to this court.

#### OPINION.

L. C. KRAUTHOFF, Special Judge, after stating the facts as above, delivered the opinion of the court:

I.   It is indisputable, and, indeed, it is conceded, that:

(a)   Henry Shaw's devise of property to constitute "a Botanical Garden, with a museum and library connected therewith," so as to provide "for the use of the public a Botanical Garden easily accessible, which (shall) be forever

kept up and maintained for the cultivation and propagation of plants, flowers, fruit and forest trees, and other productions of the vegetable kingdom, and a museum and library connected therewith and devoted to the same, and to the science of botany, horticulture, and allied objects," to be preserved "to the use and enjoyment of the public for all time," or, as described in another paragraph, "a botanical garden for the propagation and cultivation of specimens of plants, flowers and fruit and forest trees, for the promotion of science and knowledge, . . . for the use of the public at large" and the directions of his will to "establish public lectures upon botany and its allied sciences," coupled with provisions for the enlargement of said garden, museum and library, and for the establishment of a fully equipped "school of botany (in connection with Washington University at the City of St. Louis) for the promotion of education and investigation in that science and its application to horticulture, arboriculture, medicine and the arts, and for the exemplification of the Divine Wisdom and Goodness throughout the vegetable kingdom," and for "instruction to garden pupils, . . . both in practical and scientific horticulture, agriculture, and arboriculture," as also for keeping up "the ornamental and floriculture character of the garden" and for "scientific investigations in botany proper, in vegetable physiology, the diseases of plants, the study of the forms of vegetable life and of animal life injurious to vegetation, (and) experimental investigations in horticulture, arboriculture, etc.," define a charity in the fullest sense of the term, and create a charitible trust of the most unimpeachable character (State ex rel. v. Academy of Science (1883) 13 Mo. App. 213, 216; Missouri Historical Society v. Academy of Science (1887) 94 Mo. 459, 466; Trustees of the British Museum v. White (1826) 2 Sim. & S. 594, 596; United States v. Drummond (the case of the Smithsonian Institute), summarized in Whicker v. Hume

(1858) 7. H. L. Cas. at 155; Perin v. Carey (1861) 24 How. 465, 506; Jackson v. Phillips (1867) 14 Allen, 539, 551, 552; Beaumont v. Oliveira (1869) L. R. 4 Ch. 309, 313, 315; Russell v. Allen (1882) 107 U. S. 163, 167; Re Holburne (1885) 53 L. T. 212, 214, 215; Re Berridge (1890) 62 L. T. 365; affirmed (1890) 63 L. T. 470; 2 Pom. Eq. Jur. (2 Ed.) sec. 1023);

(b)   It has been long settled, and is most firmly established, that a trust of this nature will be recognized, protected, and enforced by the courts of chancery of this State as a part of their general jurisdiction over such trusts—a jurisdiction which is not based upon and which does not need the support of Stat., 43 Eliz., c. 4; and, also, that the testamentary provisions above referred to do not depend for their validity upon the enabling enactment of March 14, 1859, and derive no additional stability by reason thereof   .(Chambers v. St. Louis (1860) 29 Mo. 543; Academy of Visitation v. Clemens (1872) 50 Mo. 167; Goode v. McPherson (1872) 51 Mo. 126; Schmidt v. Hess (1875) 60 Mo. 591; Howe v. Wilson (1886) 91 Mo. 45; Missouri Historical Society v. Academy of Science (1887) 94 Mo. 459; Powell v. Hatch (1890) 100 Mo. 592; Barkley v. Donnelly (1892) 112 Mo. 561; Sappington v. School Fund Trustees (1894) 123 Mo. 32; Women's Christian Association v. Campbell (1898) 147 Mo. 103), and,

(c)   This part of. the will of Henry Shaw operated as an immediate devise of the property affected thereby to the trustees therein named, and his heirs at law at no time and under no circumstances can acquire or successfully assert any interest therein   (Sohier v. Trinity Church (1871) 109 Mass. 1, 19; Ould v. Washington Hospital (1877) 95 U. S. 303, 316; In re John's Will (1896) 30 Or. 494, 516, 526; Attorney-General v. Earl of Craven (1856) 21 Beav. 392, 410).   Hence these heirs were not necessary parties to this suit (Barkley v. Donnelly (1892) 112 Mo. 561).   The public

is the beneficiary of the trust, and the Attorney-General, as its representative, was the only real party in interest or required to be made a defendant    (Women's Christian Ass'n v. Campbell (1898) 147 Mo. 103; Jackson v. Phillips (1867) 14 Allen, 539, 579).

II.    The power of a court of chancery to vary the precise terms of a charitable trust, has been much discussed. The present case does not call for a further amplification of the rules recognized in the cases heretofore determined by this court, in respect of occasions or reasons for the application of the *cy pres* doctrine, so-called, to instances where the object of the testator can not be literally accomplished, or not in the precise mode pointed out by him.    Here, the object—the charity—was *in esse* at the testator's death, and it remains wholly unchanged and unimpaired; and the mode pointed out in the will for accomplishing and maintaining that object is not at all involved on this appeal.    The difficulty which has arisen in the execution of the present trust is of an administrative character, i. e., if it be true, in point of fact, that it is impossible (in a legal sense) for the trustees to observe the directions of the will that given tracts shall not be absolutely aliened by them, but let permanently only upon building leases of the character mentioned, or if an exigency has developed which renders it necessary to sell all or a part of the property in question, must the present application be denied, be the resultant consequences to the charity itself what they may?    In case the provisions concerning the object of the trust—the charity itself—and the directions as to the manner of administering its endowment, can not both be observed, is it within the power of a court of chancery to meet the emergency alluded to, and to exercise a supervising jurisdiction for the protection of the charity and its endowment?    The counsel who has so zealously asserted the rights of the Attorney-General on this appeal candidly concedes, in respect of ordinary and

proper cases, that the power and jurisdiction referred to have been overwhelmingly established by authority. But he insists that relief can not be granted in the present instance, (a) because the courts of Missouri have been ousted of their ordinary jurisdiction in such circumstances by force of the act of March 14, 1859, and, in the alternative, (b) that the evidence does not present a state of facts warranting the grant of relief in the present case.

Equally because the decree we have concluded to direct must serve as a muniment of title, and in order that the principles which are to govern the future administration of this charity, and as well in other cases of the same character, may be firmly settled, it is deemed preferable not to rest content with a mere acquiescence in the concession thus made. Looking to the testamentary provisions under consideration, it is clear that the maintenance, development, and extension of the Botanical Garden constituted the all-dominant purpose of the testator. Certainly as long ago as 1859, Henry Shaw contemplated and apparently had determined upon the establishment of this charity. He devoted many years of his life and large sums of money to this object. In the first clause of his will he clearly indicated that it had long been his dearly cherished design to "provide for the use of the public, a Botanical Garden, easily accessible, which should be forever kept up and maintained," and "to preserve the same to the use and enjoyment of the public for all time." To these ends, he enjoined that "said trustees shall forever keep certain portions of the lands described" as a Botanical Garden "for the use of the public at large; . . . for the use of the citizens of St. Louis as well as the public in general." Throughout, the will speaks an emphatic intention that the charity shall be enlarged, both in respect of the land to be devoted to extensions of the garden and of the scientific field to be covered by the various facilities for which provision is made. Mr. Shaw has made it clear, also, that his

purpose in devising the six parcels in question and the business and other properties mentioned in the third clause of his will, was to perfect his "endowment" of the Botanical Garden. From the fact that nearly all of his large fortune consisted of real estate, it is apparent that Henry Shaw had a decided preference for that form of investment, as a means to an assured income. He seems, likewise, to have been a believer in the system of granting ground leases for long periods, with covenants for the perpetual renewal thereof. But it is to be observed that he not only realized the necessity of improving real estate in order to make it productive, but that his purposes also were (a) that the six parcels in question should be made to "afford an income or revenue for the support of the said Botanical Garden," and (b) that in accomplishing this result care should be taken that "by its improvement, its contiguity may be pleasant and attractive to the visitors and students of the Botanical Garden." The permission to let the property "on short leases to nurserymen, florists, vegetable gardeners, and others," was clearly intended to serve as a temporary arrangement until prevailing conditions might enable the trustees to "profitably lease (the same) for building purposes." It is therefore manifest that next in importance to the dominant purpose above indicated, was an intention on the part of the testator to secure the improvement of this vacant property, first, in order that it might be made productive of an income—be made an endowment. in fact as well as in form; and second, that in and by its improvement the beautification of the surroundings of the Botanical Garden should be accomplished. It is necessarily implied, also, that the use of the tracts for any purpose calculated to produce a condition deleterious to the development of an ideal botanical garden with its numerous tender and exotic plants, was intended to be forbidden. These ends the testator evidently believed could be realized by means of building leases "for a term not exceeding sixty years, with a provision

in such leases for the perpetual renewal thereof for succeeding terms of not more than sixty years." In connection with the provision to this effect the trustees were denied the power to make any other or different alienation of the tracts in question. It is to be carefully observed that the testator did not so phrase these provisions as to make them *conditions,* either precedent or subsequent; they are prescribed merely as *administrative limitations* in respect of the management of the trust, and must be taken to have intended to further and to advance the dominant purpose of the will—the maintenance and enlargement of the charity mentioned (Attorney-General v. Wax Chandler's Company (1873) L. R. 6 H. L. 1, 19, per Lord Cairns; Wright v. Wilkin (1860). 2 B. & S. 232; Brown v. Baptist Society (1869) 9 R. I. 177, 186, 188; Russell v. Allen (1882) 107 U. S. 163, 166, 167; Mills v. Davison (1896), 54 N. J. Eq. 659, 664-666; Hopkins v. Grimshaw (1897) 165 U. S. 342, 356, per Mr. Justice Gray).

Again, the very leases directed to be made by the testator, for as long as sixty years, with covenants for a perpetual renewal thereof, would operate as a substantial alienation of the premises; for the execution by the trustees of a lease of this nature would be the equivalent, in legal effect, of an alienation of the property (Lydiatt v. Foach (1700) 2 Vern. 410; Attorney-General v. Brooke (1811) 18 Ves. 319, 326; Attorney-General v. Ward (1829) 7 L. J. Ch. 114, 119; Attorney-General v. Hungerford (1832) 8 Bligh N. S. 463, 468, n; affirmed, (1834) 8 Bligh N. S. 437; s. c. 2 Cl. & F. 357, 376; Attorney-General v. Pilgrim (1850) 2 Hall & Tw. 186, 188). Hence, the intent of the testator was not to forbid an alienation of any nature whatever. On the contrary, the necessary effect, and therefore the intention of the will, was not only to permit, but to expressly direct, an alienation in substance. And it is to be noted that the testator's language on the subject bears strong internal evidence of

having been carefully chosen so as to deny only to the trustees the power to exercise a power in respect of a different form of alienation.    The language used is inapt to express an intention that no such other alienation should occur, whatever the circumstances; much less does it declare that a court of chancery shall not exercise the jurisdiction which it may have in the premises, even upon a proper showing that the precise form of alienation mentioned in the will was impossible to be utilized in practice, and that a literal adherence to the restrictions in that behalf would probably result in the defeat of or serious embarrassment to the charity whose welfare was the clearly expressed controlling purpose of the testator.

The concrete question, therefore, is whether, upon a proper showing, a court of chancery has the jurisdiction to authorize an out and out alienation of the property affected by the provisions of the will in question.    Primarily, it is clear that this involves no phase of what is known as the prerogative power of *cy pres;* for here there are a defined charity, a clear trust, and competent trustees to hold the property to that end.    (Moggridge v. Thackwell (1803) 7 Ves. 36, 86; Ommanney v. Butcher (1823) 1 Turn. & Russ. 260, 270; American Academy v. Harvard College (1832) 12 Gray, 582, 596; Mormon Church v. United States (1890) 136 U. S. 1, 55).    Nor is it an instance which calls for the exercise of the usual judicial power of *cy pres,* so broadly recognized and established by the former decisions of this court, *supra;* for here the mode of accomplishing the charity, properly speaking, to wit: the provisions for the maintenance and extension of the Missouri Botanical Garden, under the supervision of the trustees named, and for the accomplishment, in other respects, of the charitable ends mentioned in the will, are complete and not sought to be departed from (Attorney-General v. Boultbee (1794) 2 Ves. 380, 387, 388; Moggridge v. Thackwell (1803) 7 Ves. 36, 69; Mills v. Farmer (1815) 1 Mer. 54, 99; Attorney-General v. Earl of Craven

(1856) 21 Beav. 392, 409, 410; Jackson v. Phillips (1867) 14 Allen, 539, 574, 593; 2 Perry, Trusts (4 Ed.), secs. 718, 722, 727, 729). The petition invokes the exercise of the court's power of administration in respect of the forms to be observed in accomplishing and furthering both the object and mode prescribed by the testator. Broadly speaking, the expression *"cy pres* power" defines a limitation as well as an affirmative authority. Where the case is one in which the chancellor can act in his judicial capacity, as distinguished from the power exercised in the English system by the Lord Chancellor as the representative of the Crown's sign-manual, the jurisdiction over charities is an inherent one, i. e.,while courts of equity, as such, possess no power to create a charitable trust, they liberally exercise a jurisdiction to enforce and preserve such a trust when it is valid in its creation. In exercising this jurisdiction, the courts proceed *cy pres:* They give effect to the expressed charitable purposes of the donor as near as may be; and in supplying or remedying the defects disclosed in practice they act in effectuation of the controlling purpose disclosed by the instrument presented *for construction, so* as to preserve and make useful "what may be called the spirit of the charity" (In re Campden Charities (No. 2) (1883) 24 Ch. D. 213, 218, per Chitty, L. J.). It is a natural and necessary branch of the jurisdiction over charitable trusts that the means or details prescribed for their administration should be subject to be molded so as to meet any exigency which may be disclosed by a change of circumstances, and to relieve the trust from a condition which imperils or endangers the charity itself or the funds provided for its endowment and maintenance. Here, too, a court of equity will approximate as nearly as may be the expressed wishes of the founder. But, in the very nature of things the jurisdiction merely "to vary the details of administration" is more liberally exercised (Jackson v. Phillips (1867), 14 Allen, 539, 580, per Mr. Justice Gray), and indeed is perhaps more firmly established and

more widely recognized than is that which is usually called the *cy pres* power of the court. "It is plain that there is a wide distinction between a deviation from the founder's intention as to the objects of the charity, and a deviation from the directions as to management, which were no doubt originally meant to be governed by circumstances" (1 Lewin, Trusts, 546; Brown v. Baptist Society (1869) 9 R. I. 177, 187, 188; Sears v. Chapman (1893) 158 Mass. 400). "There is manifestly a distinction between the scheme of charity and a scheme for administering it" (In re John's Will (1896) 30 Or. 494, 527; Dailey v. New Haven (1891) 60 Conn. 314, 321, 322). The difference is akin to that between substance and its incidents, on the one hand, and form, or rules of administrative detail, on the other; or, stated in another way, the difference is between an end in view and the means for its accomplishment. It has been laid down by high authority that in exercising the "very enlarged administration of charitable trusts, you look to the charity which is intended to be created, and you distinguish between it and the means which are directed for its accomplishment. Now the means necessarily vary from age to age . . . (and when) the means originally devised have become inadequate to the end, courts of equity have always exercised the power of varying the means of carrying out the charity from time to time. . . . (It is) the settled doctrine that the means for the attainment of the end may be altered from time to time" (Clephane v. Lord Provost (1869) L. R. 1 H. L. Sc. 417, 421, per Lord Westbury; Andrews v. McGuffog (1886) 11 App. Cas. 313, 325, 329). "What is the principal object which the testatrix had in view as distinguished from the means by which she wished that object to be carried out?" (In re Campden Charities (1881) 18 Ch. D. 310, 326, 328, per Sir George Jessel M. R.). In such a case as this a charity is in truth a ward of chancery. In respect of its administration, a court of equity exercises that power for the

protection of a charitable trust from exigent peril which the ward is powerless to exercise in its own behalf.

The earlier English chancery cases do not disclose a very clear development of this branch of the jurisdiction, apparently because the occasion for its exercise did not often arise in actual practice, and also, in all probability, because, in an age when the prerogative *cy pres* power was carried to lengths which have justly been characterized as extravagant (Attorney-General v. Minshull (1798) 4 Ves. 11, 14), this jurisdiction was naturally enough deemed to be beyond cavil. But during the century now drawing to a close, and with the decadence of exercises of the prerogative power and a greater attention to the foundation and scope of the judicial *cy pres* power, the branch of the jurisdiction now under consideration has been developed and become firmly established; although, perhaps, its basis and consequent limitations can not be said to have been at all times- clearly observed. The question has arisen under varying circumstances. Where the trustees are invested with an express power to make the alienation in question, there is, of course, no room for contention (Attorney-General v. Hardy (1851) 1 Sim. N. S. 338, per Lord Cranworth; In re Mason's Orphanage (1896) 1 Ch. 54, 59). In the absence of such an express power, it being of the very essence of a charity that it shall endure forever, lands which are made the subject of a charitable trust are deemed to be alike inalienable, whether it be so declared in terms or not. (Attorney-General v. Brooke (1811) 18 Ves. 319, 326, per Lord Eldon; Attorney-General v. Hungerford (1834) 8 Bligh N. S. 437; s. c., 2 Cl. & F. 357, 375; College of St. Mary Magdalen v. Attorney-General (1857) 6 H. L. Cas. 189, 205; Perin v. Carey (1861) 24 How. 465, 495; Odell v. Odell (1865) 10 Allen 1; Mills v. Davison (1896) 54 N. J. Eq. 659, 662-664; 2 Perry, Trusts (4th Ed.), sec. 737). "Property dedicated to a charity is inalienable necessarily" (Gray, Perpetuities, sec. 600).

A difference is also to be noted between (a) lands actually used for the charity itself, *ex gr.* (in the present instance) the tract on which the Botanical Garden is situate; (b) lands which are set apart in order to provide, by means of their income or use, a fund for the endowment of the charity; and (c) lands which are purchased or otherwise acquired by the trustees as an investment of surplus funds. In the absence of an express provision concerning the matter, property of the character last noted is taken to be held free from any general restraint upon the power to alienate which may be declared in the instrument of foundation or implied by law (In re Clergy Orphan Corporation (1894) 3 Ch. 145, 154; Governors, etc., and Skinner (1893) 1 Ch. 178).

The distinctions and differences thus noted account largely for the varying forms in which the rule has been expressed in the reported cases upon this subject. Without undertaking to review or to reconcile these in detail, it suffices for the present purpose to extract the general rule on the subject. This is thus stated in a standard treatise: "The court of chancery always had power, under its general jurisdiction to administer the estate of a charity, to alien charity property" (Tudor, Char. Trusts (3 Ed.), p. 250). Under differing aspects and in language more or less clear, this jurisdiction has been recognized or exercised on numerous occasions reported or noted in the English chancery reports: Watson v. Hinsworth Hospital (1707) 2 Vern. 596, per Lord Cowper; Attorney-General v. Mayor of Stamford (1747) 2 Swanst. (Appendix) 591, per Lord Hardwicke; Attorney-General v. Owen (1805) 10 Ves. 558, per Lord Eldon; Attorney-General v. Backhouse (1810) 17 Ves. 283, 291, per Lord Eldon; Ex parte Berkhampstead Free School (1813) 2 V. & B. 134, per Lord Eldon; Attorney-General v. Cross (1817) 3 Mer. 524, per Sir William Grant M. R.; Attorney-General v. Warren (1818) 2 Swanst. 291, 302; s. c. 1 Wils. Ch. 387, 411, 412, per Sir Thomas Plumer

M. R.; Attorney-General v. Crook (1836) 1 Keen, 121, per
Lord Langdale M. R.; Attorney-General v. Kerr (1840) 2
Beav. 420, 428, per Lord Langdale M. R.; Attorney-General
v. South Sea Company (1841) 4 Beav. 453, 457, 458, per
Lord Langdale M. R.; In re Parke's Charity (1841) 12 Sim.
329, 332, per Lord Romilly; Attorney-General v. Mayor of
Newark (1842) 1. Hare, 395, per Vice-Chancellor Wigram;
In re Suir Island Female Charity School (1846) 3 Jo. & La.
T. 171, 174, per Lord St. Leonards; In re Alderman New-
ton's Charity (1848) 12 Jur. 1011, per Lord Cottenham;
Attorney-General v. Pilgrim (1849) 12 Beav. 57, 60,
per Lord Langdale M. R.; Attorney-General v. Bishop of
Worcester (1851) 9 Hare, 328, per Turner L. J.; Re Over-
seers of Ecclesall (1852) 16 Beav. 297; s. c. 21 L. J. Ch. 729,
per Lord Romilly M. R.; Attorney-General v. Archbishop.
of York (1853) 17 Beav. 495, 501, per Lord Romilly M. R.;
Re Ashton Charity (1856) 22 Beav. 288, per Lord Romilly
M. R.; Attorney-General v. Dedham School (1857) 23 Beav.
350, 356, per Lord Romilly M. R.; In re North Shields Old
Meeting House (1859) 7 W. R. 541, per Vice-Chancellor
Kindersley; Re Colston's Hospital (1859) 27 Beav. 16, 20,
per Lord Romilly M. R.; Re Seckford's Charity (1861) 4
L. T. 321, per Lord Hatherly; Attorney-General v. St. John's
Hospital (1865) L. R. 1 Ch. 92, 106; s. c. 35 L. J. Ch. 207,
215, per Turner L. J.; In re Henry Smith's Charity (1882)
20 Ch. D. 516, 518, per Sir George Jessel M. R.; Glenn v.
Gregg (1882) 21 Ch. D. 513, 516, per Kay L. J.; Re
Browne's Hospital v. Stamford (1889) 60 L. T. Rep. 28S,
per Chitty L. J.; Re The Stockport Ragged Industrial and
Reformatory School (1897) 77 L. T. Rep. 425, per Stirling
J. Many of the pertinent cases are collated and analyzed
in the carefully prepared opinion of Stirling, J., concerning
the trust for Mason's Orphanage (1896) 1 Ch. 54; affirmed
(1896) 1 Ch. 596. By force of the extended regulations of
the subject which are embodied in Sir Samuel Romilly's Act

(52 Geo. III, c. 101), the Charitable Trust Act of 1852, and
the various amendments and supplements thereto, the juris-
diction of the English courts in the premises has become
firmly fixed upon a statutory basis; but many of the cases last
cited, *ex gr.* Re Ashton Charity (1856) 22 Beav. 288, have
made it clear that so far as the existence of the jurisdiction
here in question is concerned, the legislation referred to is
merely declaratory and not creative.

It has been noted that the power to authorize a sale of
charity property has been more frequently called into requi-
sition in this country, owing to the more rapid changes and the
other local conditions which have characterized and arisen in
the marvelous development of our cities (Gray, Perpetuities,
sec. 590, n. 3) ; and with the exception of a single *per curiam*
deliverance, and that in a state which accords no particular
favor to charitable trusts (Tharp v. Fleming (1858) 1 Houst.
580, 592), the American courts (and particularly those which
recognize the doctrine of an enlarged jurisdiction in respect
of such trusts), have been uniform and emphatic in their rec-
ognition of the power in question. Stanley v. Colt (1866) 5
Wall. 119, is generally regarded as the leading case on the
subject in our reports.    There it appeared that certain real
estate had been devised to an ecclesiastical society with a pro-
vision that it "should not be hereafter sold by the same, but
leased, and the annual rents or profits applied to the uses
or benefit of such society." A sale having been authorized
by legislative enactment (the then state of the judicial
deliverances in Connecticut having apparently made it advis-
able to obtain the authority and sanction of that depart-
ment of the State government), it was held that by such sale
a good title had passed to the purchaser, the court laying it
down as a general rule (and perhaps too broadly) that "when
lapse of time or changes as to the conditions of the property
and of the circumstances attending it, have made it prudent
and beneficial to the charity to alien the lands, and invest the

proceeds in other funds or in a different manner, it is competent for this court to direct such sale and investment, taking care that no diversion of the gift be permitted." In Ould v. Washington Hospital (1877) 95 U. S. 303, 312, it was said, referring to the will considered in Perin v. Carey, (1861) 24 How. 465, which expressly forbade, forever, the sale of any part of the devised property, that "of course, the legislature, or a court of equity under proper circumstances, could authorize or require a sale to be made." And in the interesting case of Jones v. Habersham (1882) 107 U. S. 174, 183, the court, per Mr. Justice Gray (a great authority in this branch of the law), said of a provision, that "the trustees should not alienate the land on which the school-room stands," that "it will not prevent a court of chancery from permitting, in case of necessity arising from unforseen circumstances, the sale of the land and the application of the proceeds to the purposes of the trust." The jurisdiction has been exercised where there was a specific direction that funds given to charity should be invested in certain named stocks, and in the course of time the making of such investments became impracticable (McIntire v. Zanesville (1867) 17 Oh. St. 352); where a devise was made of a given tract, in trust to support a Congregational minister, and the trustees were directed "from time to time to lease the said farm for a term of not more than seven years nor less than three years, extraordinaries excepted," a decree authorizing an absolute sale was declared to have been within the proper jurisdiction of the court (Wells v. Heath (1857) 10 Gray, 17, 27); and where it was directed that the principal of the fund to arise should be loaned only upon real estate security, it was declared that "if that particular form of security should fail or become unavailable, the trustees might be authorized to loan upon other sufficient securities without impairment of the trust" (In re John's Will (1896) 30 Or. 494, 529, 530). Similar rulings have been made in a large number of other cases, under vary-

ing provisions and circumstances: Odell v. Odell (1865) 10 Allen, 1, 16; Brown v. Baptist Society (1869) 9 R. I. 177; Weeks v. Hobson (1890) 150 Mass. 377; Crerar v. Williams (1893) 145 Ill. 625, 652; In re Mercer Home (1894) 162 Pa. St. 232, 238, 239; 2 Perry, Trusts (4 Ed.), sec. 737; 2 Story, Eq. Jur. (13 Ed.) sec. 1176.

A strikingly parallel instance is disclosed in the litigation which arose in respect of the well-known will of Stephen Girard. It was there provided, concerning certain real estate set apart as an endowment for Girard College, "that no part thereof shall ever be sold or alienated by the said mayor, aldermen and citizens of Philadelphia, or their successors, but the same shall forever thereafter be let from time to time to good tenants, at yearly or other rents, and upon leases in possession not exceeding five years from the execution thereof; and that the rents, issues, and profits arising therefrom shall be applied towards keeping that part of the said real estate situate in the city and liberties of Philadelphia constantly in good repair (parts elsewhere situate to be kept in repair by the tenants thereof respectively), and towards improving the same whenever necessary, by erecting new buildings, and that the net residue (after paying the several annuities hereinbefore provided for) be applied to the same uses and purposes as are herein declared of and concerning the residue of my personal estate." In upholding the validity of this provision the court, among other things, said (per Lowrie, C. J.): "In all gifts for charitable uses the law makes a very clear distinction between those parts of the writing conveying them, which declares the gift and its purposes, and those which direct the mode of its administration. And this distinction is quite inevitable, for it is founded in the nature of things. We must observe this distinction in studying Mr. Girard's will, otherwise we run the risk of inverting the natural order of things by subordinating principles to form, the purpose to its means, the actual and executed gift

for a known purpose to the prescribed or vaticinated modes of administering it, that are intended for adaptation to an unknown future, and of thus making the chief purpose of the gift dependent on the very often unwise directions prescribed for its future security and efficiency. . . . . Possibly some of the directions given for the management of this charity are very unreasonable and even impracticable; but this does not annul the gift. The rule of equity on this subject seems to be clear, that when a definite charity is created, the failure of the particular mode in which it is to be effectuated does not disturb the charity, for equity will substitute another mode, so that the substantial intention shall not depend on the insufficiency of the formal intention." It was declared that this was a branch of the judicial power of *cy pres* and involved no consideration of the prerogative power exercised by the crown, although it is to be noted that the court did not clearly observe the distinction between the jurisdiction in respect of the mode prescribed and that of administering the means to an end. The doctrine of *cy pres* was said to be "a reasonable doctrine by which a well defined charity, or one where the means of definition are given, may be enforced in favor of the general intent, even where the mode or means provided for by the donor fail by reason of their inadequacy or unlawfulness. . . . . It is the doctrine of approximation;" and the court asserted that in effect these views stood recognized by the decision in Vidal v. Girard (1844) 2 How. 128 (City of Philadelphia v. Girard's Heirs (1863) 45 Pa. St. 9, 25-30). Subsequently these views were practically applied under the same will, and a decree made authorizing leases of certain devised coal lands for a term exceeding that of five years specified by Mr. Girard, upon a showing that leases for so short a period rendered it impossible and impracticable to secure the working of the mines located on the property in question. The court said that "it seems to be settled law that in a proper case, a court

of equity can, in order to preserve the life of the trust, ampu-
tate its dead member" (In re Petition of Philadelphia (1868)
2 Brewst. 462, 480).

The same views have heretofore been repeatedly an-
nounced and applied by this court. Where "unforseen cir-
cumstances have transpired which isolate a part of the grounds
and render them totally unfit for the purpose designed by the
testator, . . . . a sale of this property (it was ruled)
will be in furtherance of the very purpose for which this
charity was created" (Academy of Visitation v. Clemens
(1872) 50 Mo. 167, 171; Goode v. McPherson, 51 Mo. 126,
127). "The ground upon which courts of equity interfere in
cases of this sort is that of effectuating the specific intent of
the donor" (Schmidt v. Hess (1875) 60 Mo. 591, 594). A
decree for the sale of property conveyed to two charities, to be
used by them jointly, and an apportionment of one-half of
the proceeds to each for a separate building, based upon a
showing that by a change of circumstances the location of the
property had become unsuitable for the purposes mentioned,
and that a structure to be used in common was impracticable,
was approved in Missouri Historical Society v. Academy of
Science (1887) 94 Mo. 459, 467. Generally, it has been laid
down that in such cases it is the primary duty of the court to
ascertain the dominant purpose of the donor, and to so admin-
ister the trust, and if necessary, to so modify the details pre-
scribed, in the light of emergencies which may be developed
from time to time, as to preserve and effectuate the controlling
intent (Barkley v. Donnelly (1892) 112 Mo. 561, 572, 574).
In a very recent case (in which the difference in opinion
among the members of this court arose upon the construction
of the will then at bar, and not concerning the general ques-
tion of the jurisdiction of a court of chancery in such a case
as this), it was declared to stand established in this State by
"an unbroken line of decisions that the equity branch of our

VOL. 151 mo—17

courts has no authority and power to mold the form of a charitable devise or gift to suit the necessities of changed conditions and surroundings, and that when it has been found beneficial to the charity to alien its lands and invest the proceeds in other funds or in a different manner, it is competent for the court to direct such sale and investment, so long as no diversion of the gift is permitted.  .  .  .  .  Why should it be said that if the trustee be unable to act because of some fault of his own, he may be discharged and a new trustee substituted by the court to carry out the trust, or why, if he dies and can not act, a successor may be named by the court to execute his powers; but if, because of some external difficulty, or because some particular mode designated as to the use of the property can not be executed in all its details, the court is powerless to act, is wanting in authority to move in the premises?"    (Women's Christian Association v. Campbell (1898) 147 Mo. 103, 123, 124).

In the case under consideration it is manifest that the provisions of Mr. Shaw's will for leasing the property in question and denying to his trustees the right to otherwise alien the same, "are not so essential that you can not separate the intention of charity from that particular mode" (Biscoe v. Jackson, (1887) 35 Ch. D. 460, 463, 464, per Kay L. J.; Teele v. Bishop of Derry (1897) 168 Mass. 341, 343). On the contrary, he was manifestly interested in and advised as to the law of this State concerning the subject-matter of the trust which he had under contemplation.    This is evident from the fact that in 1859, at a time when it was not definitely known what the rules governing charitable trusts in this jurisdiction would ultimately be declared to be, he asked the Legislature to make the matter certain by a special act authorizing him to formulate the plan he had in mind.    When he came to make his will in 1885 he was aware that much of the difficulty which he had apprehended in 1859 had been removed by intermediate decisions of this court, for, referring

to the act of 1859, he declared a purpose of "availing myself
of the power given me in said act (only) so far as is necessary,"
a reference manifestly dictated by an abundance of caution,
for, as already shown there is no aspect of the trust under
consideration which needed legislative sanction or aid. When
the will in question was drawn (1885), this court had decided
the above mentioned cases of Chambers v. St. Louis, Acad-
emy of Visitation v. Clemens, Goode v. McPherson, and
Schmidt v. Hess; while the instrument was still ambulatory
(the testator's death having occurred in 1889), this court
decided Howe v. Wilson, and Missouri Historical Society v.
Academy of Science, *supra;* and this court had, as far back as
1872, cited Stanley v. Colt (1866) 5 Wall. 119, with manifest
approval.    It is not an unwarranted inference that Mr. Shaw
knew of the Girard will.    There is, indeed, a marked simi-
larity in many of the provisions of the two wills, particularly
in reference to prescribing a plan of ground leases of
unimproved property and of restraining the power of the
trustees to otherwise alien the endowment fund. The
present is, therefore, peculiarly a case for the practical
application of the rule long ago laid down by Lord Eldon:
"Testators are supposed, in the eye of the law, to know the
rules by which courts are guided in their administration of
the law, as well in the case of charities as in those of individ-
uals" (Mills v. Farmer (1815) 1 Mer. 54, 79).    Mr. Shaw
must be taken to have been advised as to the powers which a
court of chancery could properly exercise in the administra-
tion of the charitable trust which he was creating; and as he
so clearly indicated a dominant purpose to promote the wel-
fare of the charity mentioned in his will, he is to be conclu-
sively taken to have "impliedly agreed that if it should
become impossible to administer the trust in the manner pro-
posed, the court might make any reasonable modification of
his scheme which might at any time become necessary" (Cary
Library v. Bliss (1890) 151 Mass. 364, 376).    His will is,

therefore, to be read as though the powers of administration which our courts have in such cases, had been in terms recited to be a part of the instrument (Duggan v. Slocum (1897) 83 Fed. Rep. 244, 246; affirmed (1899) 92 Fed. Rep. 806). It has even been broadly stated, in a leading case, that "no testator can obtain for his bequests that support and permanence which the law gives to public charities only, and at the same time deprive the beneficiaries and the public of the safeguards which the law provides for their due and lawful administration" (Jackson v. Phillips (1868) 14 Allen, 539, 571). And certainly it would evidence a great injustice to Mr. Shaw, and to his memory, to interpret his purpose so narrowly as to make the continuance or the success of his charity dependent upon the ability of the trustees to observe all the details of administration which the will outlines; upon their ability to accomplish impossibilities; and upon their ability to meet exigent necessities of a financial aspect, although without funds which are available to that end, and without power or means to provide them (Attorney-General v. Briggs (1895) 164 Mass. 561, 568).

It follows that the court possesses the jurisdiction invoked by this petition, which is one in the nature of an application by the trustees for a decree embodying adequate provisions to meet the difficulties which have arisen in the practical administration of the trust committed to them, and to enable them to overcome conditions and contingencies not provided for (and therefore, in a legal sense, unforseen) by the testator (Trustees of the Smith Charities v. Northampton (1865) 10 Allen, 498, 499). And this jurisdiction involves a duty of the most solemn nature: "We must inquire what the donor himself would now direct, had he lived to witness the present altered circumstances of the case" (McIntire v. Zanesville (1867) 17 Oh. St. 352, 363), proceeding as nearly as may be, to give effect to his expressed intentions. "There is a convenience in acting as he would himself have done. This is

the foundation (in one of its aspects) of the doctrine of *cy pres*" (Attorney-General v. Ironmongers' Company (1834) 2 Myl. & K. 576, 586).

III.   It is, however, most strenuously urged that the act of March 14, 1859, operates to oust the jurisdiction of the courts of this State in the premises here disclosed, and to forever debar them from exercising the power, which exists in all other similar cases, to authorize and direct a sale of any part of the property in question.   The argument is that by the act and the reference thereto in Mr. Shaw's will, a contract was created between the State and the testator, the obligation of which can not, constitutionally, be impaired.   The present case presents no effort on the part of the State to withdraw or qualify any privilege tendered to Mr. Shaw by the State and accepted by him.   The question is one of the proper construction of the statute; we are to ascertain the intention of the law-makers.   Did the Legislature intend to enact that if Henry Shaw made such a will as the special statute outlined and sanctioned, no court should have the power, at any time in the future, even centuries hence, nor upon any conceivable showing of exigent necessity, to mold the administrative details of the trust in question so as to authorize an alienation of a character other than that mentioned by him?   This is the concrete question presented for decision.   If it is answered in the negative, there is no occasion to consider whether it was within the power of the General Assembly to recognize the existence of a given jurisdiction in the judicial department of the State government, and, while making no change in the law on the subject, to forbid the exercise of that jurisdiction in the special instance mentioned.

In our opinion, the proper construction and the true interpretation of this enactment present no room for doubt or difficulty.   It was intended to be what it frankly professes in its title:  "An act to *enable* Henry Shaw to convey or devise to trustees certain lands" (Dart v. Bagley (1892) 110 Mo. 42).   The body of the act declares that "it shall and may

be lawful for the said Henry Shaw, by his last will," to create
the trusts and specify the provisions there mentioned.
Among the powers and privileges conferred is one "to
provide (if he saw fit) that no absolute alienation shall
ever be made of said lands, or any portion of the same,
by the trustees, therein appointed, their successors or assigns
in said trust, but that the same shall forever remain
sacred for the object and purposes of said trust."
The expressions fall far short of constituting a binding legisla-
tive direction that said tracts shall be forever absolutely in-
alienable and beyond the jurisdiction of a court of administra-
tion.    To the contrary, to quote the language of Lord Cairns,
"they are words merely making that legal and possible which
(it was apprehended) there would otherwise be no right or
authority to do.    They confer a faculty or power, and they
do not, of themselves do more than confer a faculty or power"
(Julius v. Bishop of Oxford (1881) 5 App. Cas. 214, 222).
The act is to be classified as being affirmative (2 Rawle's Bouv.
L. Dict. 1032; Suth. Stat. Construction, sec. 202; 23 Am.
and Eng. Ency. of Law, 143) and permissive in its nature.
"A permissive statute is one which allows certain actions or
things to be done without commanding them, as, for example,
allowing certain persons to make wills, to pre-empt lands,
to vote, or to form corporations" (Potter's Dwarris on Statutes,
74; Suth. Stat. Construction, sec. 205; 23 Am. and Eng.
Ency. of Law, 154).    In the absence of unequivocal terms
expressly, or by necessary implication, negativing the powers
and jurisdiction of the class of courts to which our circuit
courts belong, a statute of this character is conclusively pre-
sumed not to have intended to impair or to interfere with the
existence and exercise of such powers and jurisdiction (1
Story, Eq. Jur. (13 Ed.) sec. 80; Black, Interpretation of
Laws, 123; Suth. Stat. Construction, sec. 332, p. 421; 23
Am. and Eng. Ency. of Law, 352; State ex rel. v. St. Louis
County Court (1866) 38 Mo. 403, 408; Tackett v. Vogler

(1885) 85 Mo. 480, 484; Wheeling and Belmont Bridge Co. v. Wheeling Bridge Co. (1891) 138 U. S. 287, 293).

The occasion for this act is readily discernable. At that date it was not known whether this court, when or in case the question should come before it, would recognize, in whole or in part, the rule of an enlarged and liberal jurisdiction concerning charitable trusts which had been asserted in England and in several of the States, or whether it would follow the rulings in Virginia, Maryland, North Carolina, and elsewhere, in denial thereof; nor was it known whether it would be declared that the common-law rule against perpetuities—and this branch of the rule, as popularly understood, is probably erroneously so described (Gray, Perpetuities, secs. 2, 3, 140, 269, 560, 591)—forbade such a restraint on alienation as this special act permitted to be imposed. Bryan Mullanphy had died in 1851, leaving a large benefaction which this court afterwards declared, in language which is fully apposite here, to be of a character "which at once heralds the name and fame of their founders far and wide, and dispenses great blessings among those who are the objects of them" (Chambers v. St. Louis (1860) 29 Mo. 543, 582). The validity of the Mullanphy will was vigorously challenged, under the advice of counsel of deserved pre-eminence in their profession. In 1859, while that litigation was still pending, the persons interested in maintaining and furthering the Mullanphy Fund applied to the same General Assembly which passed the Shaw enabling act, for a grant of special privileges in behalf of that charity (Laws 1858-9, 280); thereby, probably, setting an example which induced Mr. Shaw to ask for the passage of the enabling act under review. It was not until the following year that Mullanphy's will was upheld by this court (Chambers v. St. Louis (1860) 29 Mo. 543). It was pointed out by Judge Leonard, who appeared in support of that will, that "the law of this State is now for the first time to be announced and applied in this tribunal" (29 Mo. loc. cit.

571), a circumstance which was likewise noted by the court
(p. 593). The opinion refers to the "great diversity of opin-
ion" (p. 592) which then existed in the American cases on
the subject, and which (it may be noted) has increased rather
than diminished since that date (2 Pom. Eq. Jur. (2 Ed.)
sec. 1029; 5 Am. and Eng. Ency. Law (2 Ed.), 899, 900, 942,
943). That the conclusion then reached has now become the
firmly settled law of this State, in no wise negatives the in-
ference that Mr. Shaw preferred, as the situation presented
itself to him in 1859, to have the matter settled, so far as the
charity he had in mind was concerned, by express legislative
sanction. But, as shown, the affirmative words of this statute
are entirely without effect upon the jurisdiction of the chan-
cery courts of this State. That jurisdiction could be impaired
(if at all) only by express words of restraint, or their legal
equivalent.

Great stress is laid upon the recital contained in the
preamble to this enactment, that "for the purpose of securing
to the said institution a permanent fund for all time, which
will not be diverted from the specific object which it is
designed to support, it is essential that the said real estate shall
be so conveyed or devised, and held, that the same shall not be
alienated or alienable." It is unnecessary to analyze this
language critically with a view of ascertaining whether the
dominant purpose disclosed by this recital is not to insure that
"a permanent fund shall be secured for all time," rather than
that the particular form of alienation by means of ground
leases, mentioned in a previous paragraph of the preamble,
shall be observed. It suffices to say, for the purposes of
this case, that while a preamble may be looked to in some
cases to elucidate a statute, this can only be done where there
is need for elucidation. The doubt or ambiguity in question
must arise from or exist in the body of the act, and the pre-
amble can not be invoked to create the conditions precedent
to its consideration in the premises (United States v. Oregon,

etc., Railroad Co. (1896) 164 U. S. 526, 541). "The pre-
amble is no part of the act, and can not enlarge or confer
powers, nor control the words of the act, unless they are
doubtful or ambiguous" (Yazoo, etc., Railroad Co. v. Thomas
(1889) 132 U. S. 174, 188). So, too, "if an enactment is
itself clear and unambiguous, no preamble can qualify or
cut down the enactment" (Powell v. Kempton Park Race-
course Company (1899) A. C. 143, 157, per Earl of Hals-
bury L. C.). It is equally true that a preamble can not be
resorted to in order to extend or enlarge the readily under-
stood language of the body of a statute (1 Kent Comm. 460;
Suth. Stat. Construction, sec. 212; 23 Am. and Eng. Ency.
Law, 331).

It is beyond reasonable belief that the General Assembly
intended, in 1859, to declare, in the form of a binding and
irrepealable statute, that these tracts should be forever held in
accordance with the forms and under the restrictions in
respect of the alienation thereof which are mentioned in the
preamble referred to, should the impossibility of observing
the same become ever so absolute, and even though an emer-
gency should arise which endangered the very existence of the
charity itself. In short, the act is to be construed, as the will has
been, to imply that the courts should, nevertheless, have the
same power of administration over this charity which they may
exercise as to others, and to have left the molding of the ad-
ministrative details concerning the same to the judicial power,
in the light of the conditions and exigencies which might
arise, from time to time, during the "forever" for which this
charity is established.

IV. The jurisdiction of the court in such a case is based
upon a change of circumstances, or the happening of an unfor-
seen event, producing one or both of these conditions: (a) An
impossibility to literally carry out or observe the forms or
details of administration prescribed or indicated in the instru-
ment under consideration; or (b) the advent of an exigency

or emergency creating a necessity to provide another form for administering the trust. The impossibility referred to must be more than a mere nervous apprehension, and should be based on or arise from reasons which will warrant a judicial conclusion that the condition disclosed is permanent in its nature. On the other hand, it would be impracticable to grant relief only where there is a showing of an absolute or physical impossibility, in the literal sense of the term. An impracticability which evidences a substantial impossibility will suffice.

And in such cases, the superadded element which will set in motion the power of the court to grant the proper relief, is a consideration for the welfare and requirements of the charity. The necessity referred to should be a reasonable and actual necessity, as distinguished, on the one hand, from one so overwhelmingly exigent as to be utterly impossible of being otherwise guarded against or provided for, and, on the other hand, from a merely fanciful sentiment or a prompting of mere expediency. When a proper case is presented, all the formal directions of the instrument are taken to have become secondary and subordinate, and it is conclusively presumed that the testator designed that a court of chancery should exercise its power to mold the details of administration so as to meet the exigency disclosed, and to effectuate his dominant purpose.

Among the facts and elements which have been held sufficient to warrant the conclusion that a case for the exercise of the jurisdiction was presented in the given instance, are these: A necessity created by the growth of a village into a thickly settled city, or by the change of the habits of society and the practices of men (In re Campden Charities (1881) 18 Ch. D. 310, 323; Clephane v. Lord Provost (1869) L. R. 1 H. L. Sc. 417, 421); an impossibility caused by a change of local sentiment in respect of the time for which leases should be made, it appearing that persons would not erect a good

class of houses under leases for the period originally prescribed (In re Henry Smith's Charity (1882) 20 Ch. D. 516, 518), or would not undertake to open and develop mining lands unless leases were granted for a longer time than that limited in the will (Petition of Philadelphia (1868) 2 Brewst. 462); a necessity disclosed by the fact that the locality in which the property was situate had become unsuitable for the purposes of the charity, by reason of a change in surroundings and in the uses to which the neighboring property was then being put (In re Suir Island Female Charity School (1846) 3 Jo. & La. T. 171; Stanley v. Colt (1866) 5 Wall. 119; Brown v. Baptist Society (1869) 9 R. I. 177; Women's Christian Assn. v. Campbell (1898) 147 Mo. 103); where the opening of a street through the premises (Academy of Visitation v. Clemens (1872) 50 Mo. 167), or other circumstances incident to the growth and development of a city, had rendered the premises unsuitable or inadequate for the purposes intended (Missouri Historical Society v. Academy of Science (1887) 94 Mo. 459); and, generally, where a change of circumstances or the happening of unforseen or unprovided for contingencies had made it necessary for the protection of the charity that the form of administering the fund should be changed (Jackson v. Phillips (1867) 14 Allen 539, 580; In re John's Will (1896) 30 Or. 494, 532).

In a well known case, Lord Brougham seems to have indicated that the controlling test was whether the action proposed to be taken, evidences "a provident or an improvident management of the charitable fund," or, in other words, whether it is "for the real benefit of the charity" to exercise the jurisdiction in the case presented (Attorney-General v. Hungerford (1834) 8 Bligh N. S. 437, 458; s. c. 2 Cl. & F. 357); and in this connection he instanced that the property in question might consist of vacant land, as to which there was no apparent probability of realizing a substantial income, in which case it would "be perfect madness" and "an abuse

of trust" to hesitate to accept an offer on terms which insured a large income to the charity.    While this view of the matter has apparently been recognized by some English judges (Attorney-General v. St. John's Hospital (1865) L. R. 1 Ch. 92, 106), and by several highly reputable courts in this country (Shotwell v. Mott (1844) 2 Sandf. Ch. 46, 53; Stanley v. Colt (1866) 5 Wall. 119; Brown v. Baptist Society (1869) 9 R. I. 177, 188; In re Mercer's Home (1894) 162 Pa. St. 232), we are unwilling to adopt it as indicating the only element or consideration which marks the true basis and limits of the jurisdiction in hand.    Self-evidently, a sale should not be ordered unless it will be to the advantage of the charity to do so.    On the other hand, the mere fact that such an advantage will accrue is not, of itself, sufficient to authorize that to be alienated which the donor has expressly, or impliedly, declared shall remain inalienable.    The proviso engrafted by the law upon such a direction is, that in case of present or impending impossibility or necessity, the court of chancery, proceeding with due caution, and considering the interests or requirements of the charity, may modify and mold the expressed provision so as to preserve or render possible of accomplishment the dominant purpose disclosed; but there is no just principle which confers a permission to do so at the mere discretion of the court, or upon the sole ground that it appears to be advantageous to the charity (Attorney-General v. Mayor of Newark (1842) 1 Hare, 395, 403; In re Suir Island Female Charity School (1846) 3 Jo. & La. T. 171, 174, per Lord St. Leonards; Attorney-General v. Bishop of Worcester (1851) 9 Hare, 328, 361; Attorney-General v. Stewart (1872) L. R. 14 Eq. 17, 23; Re Browne's Hospital v. Stamford (1889) 60 L. T. Rep. 288, 289; In re Mason's Orphanage (1896) 1 Ch. 54, 59; Baker v. Smith (1847) 13 Met. 34, 41; Winthrop v. Attorney-General (1880) 128 Mass. 258, 261; Women's Christian Association v. Campbell (1898) 147 Mo. 103).    The question is not one of expediency, but of an

existing exigency (Cary Library v. Bliss (1890) 151 Mass. 364, 375).

V. Applying this conservative rule to the facts of this cause, we are constrained to hold that there is no sufficient showing to warrant a decree, at this time, for the sale of the tracts which are numbered, respectively, one, two, five, and six on the plat to be found in the foregoing statement of the case. This conclusion necessitates a vacation of the decree rendered by the circuit court. Of course, this denial of authority to alienate these tracts at this time is without prejudice to a renewal of the application as to any or all of them, should the developments of the future and a further showing hereafter made, warrant a conclusion that a lease thereof as directed in the will has become impossible, or that a sale thereof is necessary, under the rules hereinbefore indicated. The evidence shows that these four tracts are now under temporary leases which yield a surplus (though small) over and above the general taxes levied thereon. And the conditions at present affecting said tracts are not sufficiently exigent to demand a sale thereof, or to create the necessity required to call into activity the jurisdiction of the court in the premises. It must be remembered that such a decree as is here asked can not be made so as to become operative in case the trustees may at some time hereafter deem it necessary for the protection of the trust, but that the impossibility or necessity referred to, is to be adjudged by the court as an existing fact. So, too, when an alienation is directed, it takes place, not by the trustees in the exercise of a power under the will, but by force of the decree of the court rendered in the exercise of its judicial power of administration in respect of charitable trusts.

VI. We agree with the circuit court that the evidence warrants and demands a direction for the sale of tract three, under the terms and conditions specified in the form of decree which we have prepared and which sufficiently indicates

our views concerning such of the interesting questions aris-
ing or suggested by the record in this case as are not specially
treated herein. At the time of Mr. Shaw's death, he was
still engaged in putting to a practical test his policy of letting
property of this character on ground leases, and was applying
that policy to other property which he owned in that immedi-
ate vicinity. Other parties were pursuing a similar policy
with reference to property of the same general character. At
that time the tracts here involved were distinctly suburban,
and their utilization for urban residence purposes was, at best,
a matter of the distant future. Since his death there has
developed and become fixed a wide-spread conviction in the
minds of the people of the city of St. Louis—one that is shared
by them in common with the inhabitants of other cities which
the trustees caused to be visited for the purpose of ascertain-
ing the general prevalent public opinion on the subject, and
which, indeed, prevails in this country generally—against ac-
cepting such ground leases, particularly when it is desired or
exacted that residences shall be erected on the property leased.
This conviction is especially strong where there is a require-
ment that the lease shall contain a covenant binding the lessee
to a payment of taxes and special assessments levied on the
property. This feeling is partly due to a dissent from the
feudal system, of which leases such as Mr. Shaw directed
to be made, marked a prominent phase; partly to an objec-
tion to paying the special assessments made for the
improvement of the property and thus to the enhancement
of the value upon the basis of which alone the covenant
for a renewal can be availed of; partly, to an inability to
negotiate a loan with which to erect a residence on real
estate held under such a lease, the covenants of which
would, in practical operation, constitute an underlying
incumbrance; and partly, because so much other eligible
property of the same general character and situation is offered
for sale in fee and on easy terms, that any argument of elig-
ibility or attractiveness, which might ordinarily be urged in

behalf of the Shaw property, is without effective influence upon the minds of home-seekers.   Hence it is not surprising to learn that the plans of Mr. Shaw and of the others above referred to, in this behalf, have failed of fruition, and that when the trustees made an earnest effort to lease this tract three, in convenient parcels, and under restrictions of the nature enjoined by the will, they received few inquiries and no offers.   The will of Mr. Shaw, and, as well, the nature and welfare of his charity, limit the uses to which this property can be put.   The will requires that the property shall be so disposed of that "by its improvement its contiguity may be pleasant and attractive to the visitors and students of the Botanical Garden," and the interests of the Garden make it necessary to prohibit any structure in its vicinity which is calculated to become or to give rise to a nuisance, or other condition inimical to tender vegetation.   Again, an unexpected growth of the population of the city has increased the demand for residence sites; and the record discloses a graphic instance of the transformation of outlying property into an urban residence district by means of the extension to it of a rapid street railway service—that wonderful instrumentality which has been so conspicuous a factor in our modern municipal upbuilding, and which enables those who do business in the city districts, to escape the noises, vapors and other discomforts incident to life in a crowded and congested metropolis, with but a slight loss of time in traveling to and fro, and at a small outlay.   The discoveries in respect of utilizing electricity to provide such a service, one that is both rapid and cheap, have occurred since Mr. Shaw's death.   The result is that while other property in the very same neighborhood has been freely bought and liberally improved, the trustees have been unable to lease any part of the property in their charge for residence purposes.   It is a further result that much valuable property belonging to this trust is not only lying idle, but that its taxable value is constantly increasing, and, conse-

quently, the demands upon the income which the trustees derive from other sources are yearly becoming proportionately greater. -At present, this income barely suffices to maintain the charity, and much of the business property from which the same is derived is so located and in such physical condition that a decrease rather than an increase in this respect is reasonably to be looked for. As the‑ property in question can not be leased in accordance with the directions of the will, and as large sums are required to be annually expended in order to prevent its sale for unpaid taxes, it is, to all intents and purposes, a burden to the trust, instead of a useful endowment. In short, the directions of the testator in this behalf have become impossible of literal observance; the details of administering the charity must, as to this tract, be varied. There must be an alienation in fact, instead of undertaking to adhere to the policy of accomplishing an alienation in effect by means of leases, perpetually renewable, as specified in the will.

It also appears to be necessary to direct this alienation in order to preserve the endowment. It is an inseparable incident to the development of outlying property into a residence district that many expensive improvements become necessary: streets are required to be opened, graded and paved, and sidewalks, a system of sewerage, and a supply of water and light must be provided. Under the charter of the city of St. Louis, as is generally the case in our form of municipal government, the cost of nearly all of these necessities and conveniences is charged upon the property found to have been benefited thereby, and in default of payment of this charge, within a limited time, the lien evidenced thereby is enforced by a judicial sale of the property. In the present instance, several ordinances have already been passed to open streets through tracts three and four. A number of measures are pending or impending requiring other streets to be opened through one or both of them, and for grading,

paving, sidewalks, sewers, and other purposes essential to the health and comfort of the persons who have purchased and improved neighboring tracts. This progressive march can not longer be stayed, and, indeed, within proper bounds, is as commendable as it is imperatively essential. As a result, large assessments against these tracts at an early day, are inevitable. A failure to pay these assessments will necessarily precipitate an enforced sale of the property. The trustees can no more protect the interests of the charity at such sale than they can discharge the assessments in advance. They are without available funds to accomplish either of these ends, and the will gives them no power to provide them. Indeed, these assessments will accrue as well against the Botanical Garden tract. In advance of their being made, the amount which will be needed to defray them is necessarily a matter of merely approximate estimate. That amount will largely depend upon the extent of the grading to be done, the number of streets which may be opened, the material to be used for paving; the extent of the sewerage system which may be provided, and other like elements. In addition, it will be necessary to improve the greater part of this tract three so as to make it available for advantageous sales, by being conveniently adapted for use as residence sites. The estimate of the amount which will be needed to defray the special assessments and other expenses to accrue on these various accounts, so far as tract three is concerned, vary from $66,148.24 to $103,-974.92. This tract has a frontage on Flora avenue of about 4,700 feet and a depth of 235 feet to an alley. It not only presents the most pressing necessity for an alienation, but there is, also, good reason to believe that it can be sold more readily and to better advantage than any of the other tracts.

VII. The matters mentioned and the reasons assigned in the preceding paragraph apply as well, in all substantial respects germane to this consideration, to the tract numbered four. While the exigency calling for a present sale of this

tract may not be quite so imperative as that which the evidence shows in respect to tract three, we are of the opinion that a present authority to alienate this tract should also be decreed.    This is a much larger tract and contains about 138 acres.    It lies between Shaw, Grand, and McRee avenues, and the Old Manchester Road.    A very small part of it was let on ground-leases by Mr. Shaw in his lifetime.    His inability to obtain a greater number of these leases and the dissatisfaction of those who now hold those which are outstanding, do much to explain why it has become impossible to lease this tract as directed in the will; and the tract is so situated and environed as to involve the necessity of providing a much larger sum for its protection and improvement than in the case of tract three, the estimates in regard to it varying from $102,613.88 to $339,831.46.

VIII.    It is accordingly ordered that the decree appealed from be vacated, and. that the cause be remanded to the circuit court with directions to take the proper steps to substitute the persons or officers who have, pending this appeal, succeeded any of the plaintiffs herein as members of the Board of Trustees created by said will; to cause the present attorney-general to be substituted as a party defendant; to dismiss the petition as to the individual defendants named therein; and to thereupon enter the following decree:

"This cause coming on to be heard, come the parties by their respective attorneys, and thereupon the court, having considered the mandate which has been issued by the Supreme Court of Missouri in the above entitled cause, doth, in pursuance of the directions in said mandate contained, find, adjudge, and decree as follows:

"First.    The court doth find that the directions and restrictions contained in the first and third paragraphs of the first clause of the will of Henry Shaw, deceased, dated January 26, 1885, concerning the leasing and non-alienation by the trustees under said will, so far as the tracts hereinafter

referred to as numbers three and four are concerned, have, because of change of circumstances occurring since the death of said testator, become and are now impossible to be performed and observed, and that since said death there has arisen and now exists a necessity that said tracts numbered three and four shall be sold and aliened as hereinafter provided.

"Second. The court doth adjudge and decree that the tracts so referred to and known as tracts numbered three and four, respectively, be sold and aliened in fee, free from any of the trusts, restrictions and conditions in said will declared and set forth, and subject only to the terms, restrictions and conditions set forth in this decree or in the deed or deeds of conveyance to be made thereof by virtue hereof. The tracts thus referred to are described, respectively, as follows:"

Tract Three. A tract of land and containing about thirty-one and twenty one-hundredths (31.20) acres, being all that part of U. S. Survey No. 1293 of the Prairie des Noyers common fields, which is bounded north by survey 1452, or land formerly owned by Mary L. Tyler, south by survey No. 1271, or Flora avenue, west by Tower Grove avenue, and east by Grand avenue.

Tract Four. A tract of land containing one hundred and thirty-eight (138) acres, being all that portion of Surveys Nos. 1283, 918, and 1519, of the Prairie des Noyers common fields, which is situated between the west line of Grand avenue and the center line of Old Manchester road, and which is bounded on the north by land formerly owned by Mary McRee, or McRee avenue, east by Grand avenue, south by Survey No. 1452, or land formerly owned by Mary L. Tyler, or Shaw avenue, west by the center line of Old Manchester road, with the exception of the portion fronting on Grand avenue, conveyed by Henry Shaw in his lifetime to the Episcopal Orphans' Home and Mount Calvary Church, and of the five (5) acre tract at the southeast corner of Old Manchester

road and McRee avenue, conveyed by Henry Shaw, April 1, 1843, by deed recorded in Book C, 3, p. 120; provided that such parts thereof as are now under lease or subject to any other right of possession shall not be sold hereunder until such leases or rights shall respectively have expired or otherwise lawfully terminated. Said tract of land is also subject to such rights as the city of St. Louis may have to certain portions thereof, used for public streets or highways, within the boundaries of the above described tract of land.

"Said sales shall be made by the said trustees, or their successors, or a majority of them, by the authority of this court and acting under this decree. Such sales shall be made in such parcels or subdivisions, on such terms and conditions, and subject to such restrictions as to building lines, cost and character of structures to be erected thereon, and the use to which said property and improvements shall be put, as the said trustees, may, from time to time, deem advisable. Said restrictions shall be framed with particular reference to insuring that said property, when improved, will by its contiguity be pleasant and attractive to the visitors and students of the Missouri Botanical Garden. Said sales may be made either at public vendue or privately. Said trustees are authorized to lay out, plat, grade, and improve such portions of said tracts as may be desirable, so as to fit them for use as residence districts and sites, and also to lay out such streets and alleys as may seem necessary to insure an advantageous sale thereof, and to dedicate said streets or alleys, or any part thereof, as public highways.

"Third. The court doth further adjudge and decree that the net proceeds of all such sales shall be paid over to the plaintiffs' trustees and to their successors in trust; and the plaintiffs and their said successors are authorized and empowered to apply any moneys now in their hands as such trustees, and such of the future revenues of said trust which may be available for that purpose, or any part of said moneys

or revenues, in discharging any and all special taxes or assessments now or at any time hereafter levied on or against any of the tracts mentioned in the first clause of the said will. The proceeds of sales made hereunder shall be applied by them to the discharge of any and all special taxes and assessments levied or to be levied on or against said tracts three and four, or any part thereof, or the tract on which said Missouri Botanical Garden is situated, and to the payment of the cost and expenses of grading and otherwise improving the said tracts three and four, in whole or in part, so as to put them in condition to be advantageously sold for residence sites; and out of such proceeds said trustees, or their successors, may, if they shall deem it advisable, discharge any special taxes or assessments on or against, or for the improvement, so as to put the same in fit condition for residence sites, of any of the other tracts in said first clause described, which are known in the petition and other proceedings herein, as tracts one, two, five, and six. Such of said proceeds which may not be required or expended for either of the foregoing purposes, shall constitute a fund for the endowment and maintenance of the charity in and by said will mentioned and established, and only the income thereof shall be used for the purposes of said trust; provided, that if at any time such income shall exceed the amount needed for the support and maintenance of said charity, the said trustees may apply to this court for leave to expend such surplus in the enlargement of said Botanical Garden, or for any of the purposes in connection therewith mentioned in or sanctioned by said will. Such proceeds of sales not so required or expended as aforesaid shall be invested only in bonds of the United States or of the State of Missouri; or, in such bonds of the city of St. Louis or of Kansas City, in the State of Missouri, as the court may upon examination find to have been lawfully issued and otherwise approve; or, in safe real estate loans secured by first mortgage on improved real estate in the city of St. Louis; or, in

the betterment, reconstruction or restoration of any of the income-producing properties mentioned in the third clause of said Henry Shaw's will; or, in the improvement of any of the unimproved property belonging to said trust; or, with the approval of this court, in the purchase of any other improved real estate in the city of St. Louis, or the purchase and improvement of any unimproved real estate in said city; or in any other municipal bonds or first mortgage real estate securities which the court may hereafter authorize or approve.

"Fifth. The court doth further adjudge and decree that whenever any deeds or other instruments conveying or affecting any part of the real or personal property belonging to said trust or to the board of trustees thereof, shall have been duly authorized by a majority of the board of trustees of the Missouri Botanical Garden at any meeting thereof regularly held and called, and shall be duly executed by the president of said board, or the acting executive of the board for the time being, on behalf and in the name of the board, the same shall be sufficient in law under the fourth paragraph of the first clause of said will, to convey all the right, title and interest of said board, and of each member thereof, in said real and personal estate to be conveyed or affected by such instrument as fully, and with the same force and effect, as if each of said trustees had executed the same in person.

"Sixth. The court doth further adjudge and decree that any and all deeds or other instruments conveying or affecting any part of said tracts numbered three and four, or either of them, executed by the said president of the board of trustees of the Missouri Botanical Garden for the time being, shall pass to the grantee therein named, and his heirs and assigns, all the right, title and interest therein specified and authorized and directed to be conveyed by this decree, without obligation or duty on the part of said grantee, or his heirs or assigns, in respect of the authority of said presi-

dent in the premises or as to the application of the purchase money.

"Seventh.   The court doth further adjudge and decree that the application in the petition herein contained for authority to sell and alien certain other tracts in the first clause of said Henry Shaw's will mentioned and described which tracts are designated in said petition and in the proceedings heretofore had herein as Nos. one, two, five and six be and the same is hereby denied, for want of a sufficient showing that it is now impossible to lease the same as required by said will, or there is at present necessity for the sale thereof; but such denial is specially declared to be without prejudice to any renewal of said application as to any or all of said tracts when the plaintiffs or their successors are thereunto advised by counsel; and this cause is ordered to stand continued from term to term with leave to make such renewed application on reasonable notice to the then Attorney-General of Missouri and with the right reserved unto the court to make such other and further orders or decrees or modifications hereof or supplements hereto as to it may seem meet.

"Eighth.   It is further ordered that either party hereto may hereafter, from time to time, apply to the court for such further orders at the foot of the decree as may be necessary for the due execution of the same.

"Ninth.   It is further ordered, adjudged and decreed that the costs of this proceeding shall be paid by the plaintiffs from the trust estate under their charge."

GANTT, C. J., SHERWOOD, BURGESS and MARSHALL, JJ., concur; BRACE and ROBINSON, JJ., concur in the opinion, but dissent from the conclusion of fact stated in paragraph VII. thereof, and therefore from the direction to sell said tract No. four; VALLIANT, J., not sitting.